RENWOOD FOOD PRODUCTS, INC., RESPONDENT, v. ROY SCHAEFER, ALSO KNOWN AS LEROY PETER SCHAEFER, APPELLANT.—223 S. W. 2d 144.

St. Louis Court of Appeals.   Opinion filed September 20, 1949.

940

*Beckemeier & Beckemeier, Theodore E. Beckemeier* and *J. E. Sigoloff* for appellant.

*G. Carroll Stribling* and *Fordyce, White, Mayne, Williams & Hart-man* for respondent.

ANDERSON, J.—This is an action to enforce by injunction the provisions of a restrictive covenant in a contract of employment. From a decree in favor of plaintiff, defendant has appealed.

Plaintiff, Renwood Food Products, Inc., is engaged in the business of selling frozen foods at wholesale. Defendant, Roy Schaefer, also known as LeRoy Peter Schaefer, entered plaintiff's employ in September, 1947, as a salesman. On September 11, 1947, the parties executed a written contract which contained the terms of defendant's employment. The material portions of said contract are as follows:

"1. Beginning on the 2nd day of September, 1947, the Company agrees to employ Employee as Salesman on a monthly basis at a salary of Two Hundred ($200.00) Dollars per month, plus commission. Employment of Employee shall be subject to termination either by the Company or by Employee on fifteen (15) days' notice in writing to the other party, with or without cause.

"2. In consideration of his employment by the Company, Employee agrees that on termination of his employment for any cause whatsoever, he will not directly or indirectly engage in the business of distributing frozen foods or in any competitive business within the City of St. Louis, Missouri, St. Louis County, Missouri, Madison County, Illinois, and St. Clair County, Illinois, nor in any manner be connected with or employed by any person, firm or corporation engaged in the business of distributing frozen foods or any competitive business, for a period of one (1) year from the date when his employment under this contract ceases.

"3. Employee agrees that upon termination of his employment for any cause whatsoever, he will surrender to the Company in good condition any record or records kept by him containing the names, addresses and other information with regard to customers of the Company served by Employee."

At the time defendant was employed he had had no previous experience in the frozen food business, but had been employed as

a bread salesman. He also had some previous experience in selling to the grocery trade. Defendant received no special instructions in the sale of frozen foods. He was introduced to the trade by a Mr. McClymont, a salesman employed by the plaintiff in the north St. Louis territory and who was then leaving plaintiff's service. There were no trade secrets communicated to defendant.

Defendant, at the trial, contended and testified that the written contract did not contain the entire agreement between the parties, but that on September 1, 1947, he entered into an oral contract with plaintiff whereby it was agreed that the defendant was to be assigned the north St. Louis territory exclusively; that he was to receive a salary of $200 per month, plus a commission of 4% on all sales in excess of $5,000 per month; that he was to receive 5 cents per mile for his automobile expense; and was to work five days per week and one-half day additional every third or fourth week.

The north St. Louis territory, according to the evidence, was bounded on the south by a line running east and west along Market Street, through Richmond Heights, and thence westwardly along Clayton Road, and on the north and west by the northern and western boundaries respectively of St. Louis County. Originally, the territory was bounded on the east by Grand Avenue, but later it was extended to the Mississippi River.

In his selling activities, defendant was restricted to the north St. Louis territory. He was not permitted to solicit the business of so-called "house accounts." "House accounts" were defined as accounts of certain chain stores within the territory. Defendant testified that no mention of "house accounts" was made at the time he was employed, but he was told he would be the north side man and "have everything there." He further testified that he did not inquire whether that meant all accounts, but he understood it to be that way. At the final hearing he testified he was told he would have the exclusive right to that territory.

Mr. John Hall, Vice-President of plaintiff company in charge of sales, testified that when defendant was employed the subject of "house accounts" was discussed. He stated that he told defendant there were certain accounts that were sold by the house on which no commission would be paid should he call on them, and that there were no "house accounts" on the list that was turned over to defendant at the time he was employed.

At the final hearing defendant testified that Hall did tell him he would have only the retail trade in that area.

It also appears from the evidence that defendant was not permitted to sell to "institutional accounts" defined in the evidence as customers who do not purchase for the purpose of re-sale, but who use the produce purchased in the prosecution of their business. Hotels, hospitals, restaurants, bakeries, and cafeterias fall within this category.

In fact, defendant's selling activities were limited to the retail grocery trade.

Mr. Hall denied that there was any agreement giving defendant exclusive rights in the north St. Louis territory, or that the number of work days were fixed by agreement, but admitted the existence of an oral agreement with the defendant outlining the general terms of defendant's employment. He stated that the agreement was that defendant was to receive $200 per month, with a 4 per cent commission on all business he did which exceeded $5,000 per month, plus a car allowance of 5 cents per mile. He further testified that, in order to facilitate bookkeeping, the car allowance was later changed to $50 per month, which was practically the same amount as defendant received while operating on the 5 cents a mile basis. The $50 per month was to be paid during vacation as well as during the work period. Mr. Hall further testified that there was never any complaint by defendant over the change in figuring the car allowance. He also testified that he explained the change to all of the salesmen, at a meeting, and that it was agreed to by all of them, including defendant. Mr. Hall stated that prior to that time it had been the practice for salesmen at times to make personal deliveries to customers in order to favor them, even though the company maintained an adequate delivery service. This had the effect of increasing the mileage on the salesman's car. Hall testified he told the salesmen at the meeting that if they discontinued this practice, as he had from time to time urged, they would be ahead on a flat monthly car allowance.

Defendant testified that the change from the 5 cents a mile basis was made six months after he was employed and without notice to him. He stated that the first knowledge he acquired of the change was when he received his first check after the change was made. At that time he received a check for $25 with his salary check and, when he made inquiry concerning it, was told that it was for the expense of his car and that he would thereafter receive $50 per month for that item, payable semi-monthly. He stated that he objected to the reduction in the car expense, stating that with the high cost of gas the amount allowed would not cover his car expense; that he was not at all satisfied with the arrangement and told Hall he "would have to find out about it," but never took up the matter with him after that date. He further testified that there were one or two months when the car expense, figured on the basis of five cents a mile, amounted to less than $50, and other months when it would amount to more. He stated that on some occasions his car expense amounted to $70, figured on the five cents a mile basis, and on one occasion his car expense was even higher. At another point in his testimony he stated that his car expense averaged sixty or sixty-five dollars a month during the six months' period he received five cents a mile for car expense. He further testified he did not recall any meeting at which the salesmen

were informed. of the change in their car allowance. However, he stated he did not attend all the meetings that were held.

It further appears from the testimony of Mr. Hall that in the north St. Louis territory there were approximately 600 stores selling frozen foods, and in all about 2500 grocery stores in the area, all of which were prospective customers.

Defendant testified there were 250 concerns selling frozen foods in said area, and between 2000 and 3000 so engaged in the greater St. Louis area. The greater St. Louis area consists of the City and County of St. Louis, Madison County, Illinois, and St. Clair County, Illinois. He also stated there were between twelve and fifteen thousand retail grocery outlets in the greater St. Louis area that were prospects for the sale of frozen foods.

Mr. Hall testified that in the greater St. Louis area there were about 5,000 grocery and confectionery stores, of which number 1300 or 1400 were handling frozen foods.

When defendant entered plaintiff's employ he was given a list of 125 customers in the north St. Louis territory, all of which, according to the testimony of Mr. Hall, were active accounts, except perhaps a dozen or so which were not buying at the time. Defendant was not limited to the list given him, but could call on any prospective customer within the territory assigned to him, with the excepton of the "house accounts" and the "institutional accounts." There were six or seven other frozen food distributors that worked the north St. Louis territory in competition with Renwood Food Products, Inc.

At the time defendant entered into his employment with plaintiff he was the only salesman assigned to the north St. Louis retail territory. In January, 1948, plaintiff employed the services of another salesman, Mr. Charles Gagnepain, and assigned him to the same territory with the defendant.

Defendant testified that at the time Gagnepain was employed he objected to putting another man in his territory for the reason that it would cut down his sales and have an adverse effect on his commission.

At the request of Mr. Hall, defendant turned over to Gagnepain about ten of his accounts. Defendant testified that some of these were active accounts. Mr. Hall testified that he went over defendant's accounts at the time and found from the records several that were not being called upon and from whom plaintiff was securing little, if any, business. He stated that he then asked defendant if he had any objection to turning over a few of these accounts to the new man and defendant replied he had absolutely no objection to so doing. Defendant's list of customers at that time contained about 125 names. According to Hall's testimony, defendant was not restricted to this list but could call on approximately 600 stores dealing in frozen foods in his territory. On the contrary, defendant testified that he

and other salesmen were informed by Mr. Hall that it was not physically possible for a salesman to handle more than 100 accounts, and that 100 accounts were supposed to be the limit for each salesman, which limit was not mentioned to him at the time he went to work for plaintiff.

Defendant continued in the employ of Renwood Food Products, Inc., until October 4, 1948. On that date defendant, by letter, tendered his resignation. No one connected with the company had in any way indicated that they wanted defendant to leave his employment. Hall told defendant he was sorry he was quitting the service of the company and asked defendant why he was leaving. In reply defendant stated that he owned a bottling distribution company which was in bad condition and that he desired to give all of his time and attention to it. He made no mention of going into the frozen food business in competition with the plaintiff company. At a subsequent conversation with Hall, between the date of his resignation and November 1, 1948, defendant made substantially the same statement and was told by Hall that he could have a position with the company whenever he wished to return.

Thereafter, plaintiff received from one of its salesmen· a circular letter advising grocers that General Meat Company had taken over distribution of Honor Brand Company frozen foods. The circular letter contained also the following announcement:

"TO THE GROCERS OF ST. LOUIS

"It is our real pleasure to announce the addition of a frozen food department to our present business.

"We feel most fortunate to have obtained the services of Mr. Roy Schaefer to manage this division. He has called on you for twelve years, offering various food items. He knows your problems and can talk your language.

"You will not be offered a myriad of different frozen food brands. Stokely's Honor Brand fruits and vegetables will be featured.

"Our frozen food department will begin operation on November 1. To give the finest service and the finest quality frozen foods obtainable is our pledge to every grocer in the St. Louis area."

The foregoing appeared over the signature of "The General Meat Company," and was mailed from California by the Stokely Company, packers of Honor Brand foods.

The plaintiff called as a witness Irving J. Reinhardt, President of the General Meat Company, who testified that he did not recall the date when he first spoke to defendant about being employed by his company, but that it was possibly a week or so before October 1, 1948. He stated that he understood at the time that defendant was not employed by Renwood Food Products, Inc., and that defendant was to have started work for the General Meat Company on Novem-

948

ber 1, 1948, but, on account of this suit, was not put on the payroll. Reinhardt further testified that he discussed the circular letter with defendant before it was printed and sent out, and that defendant agreed it would be a very good idea to send it out.

Defendant testified he learned that Renwood Food Products, Inc., was going to take over the distribution of the Pick Sweet line of frozen foods about the first week in September, 1948, and that he later went to California to see the Honor Brand people. Prior to that time plaintiff company had been handling Honor Brand products. Defendant further testified that he went to California after October 4, 1948, and that he did not have any conversations with anyone representing Honor Brand Company, or with Mr. Reinhardt of the General Meat Company, until after he resigned his position with Renwood Food Products, Inc. When pressed on cross-examination, defendant testified that he was not certain as to whether he went to California before or after August 4, 1948. Upon being questioned by the Court, he stated that he went to California to secure the Honor Brand for himself as distributor and intended to turn it over to Mr. Reinhardt's company.

James H. Wood, President of Renwood Food Products, Inc., testified that during the first part of August, 1948, he discussed with defendant the plan of adding the Pick Sweet line to plaintiff's line of frozen foods.

Hall, recalled as a witness, testified that during August defendant came to him and told him about losing money in his bottling distribution business and that he would require some time to devote to it immediately. He further testified that it was agreed between them at the time that defendant would take a few days off to attend to his matters and that defendant took off four or five days.

Within the greater St. Louis area there were various chain stores and buying groups. Branches of these stores were located in the north St. Louis territory.

Rapp's, Inc., had three stores in the north St. Louis territory, and a fourth in south St. Louis—on Watson Avenue. During the time defendant was employed by Renwood Food Products, Inc., he called on these stores. Defendant testified that he obtained the business of these stores through his contact with Cy Young, the man in charge of the produce buyers for the Rapp stores. It appears from the evidence that individual stores of Rapp's, Inc., must secure permission of the officers of the company before purchasing any specific line of produce, and that this permission is given by Mr. Cy Young or Mr. Fred Rapp.

The A & P chain operated about fifty stores in the territory served by Renwood Food Products, Inc., both in Illinois and in St. Louis and St. Louis County. Plaintiff company sold its line to these stores until February 1, 1948, and defendant called on these stores from the time

he was employed until Renwood Food Products, Inc., ceased to do business with them. Hall testified that he had hopes of again selling plaintiff's products to the A & P stores. All purchases made by the A & P stores were regulated by the home office of the company on South Grand Avenue in the City of St. Louis.

There were several buying groups or associations operating in the territory served by Renwood Food Products, Inc. One of these was the A. G. group which operated approximately 400 stores in Renwood's territory. Better than one-third of these stores were in the north St. Louis territory. Defendant sold to some of these stores when he worked for plaintiff company. A Mr. Bushman, of Bushman's Market, one of defendant's customers, was a director of the A. G. organization.

The Tom Boy Stores, another buying group, operated 256 stores in the four areas mentioned in defendant's employment contract. Some of these stores were solicited by defendant while in plaintiff's employ.

The I. G. A. stores, another buying group, had about one hundred stores in the territory covered by the restrictive covenant, some of which were in the north St. Louis territory. Defendant sold to some of these stores.

There were about 250 Nationwide Stores throughout the area with a set-up similar to Tom Boy stores and I. G. A. The General Grocer Company suggests and recommends to the members of this group what they should buy, and there is a tendency for the stores in this group to act together in the matter of buying. Defendant had occasion to call on the stores of this group while he was employed by Renwood. Hall testified that his company was still selling to this group.

Hall further testified that in his opinion defendant would be able to take away from Renwood much of the business of the chain stores and buying groups above mentioned. He stated that he did not mean that he would be 100% successful, but that the good will and acquaintanceships defendant had developed could be used by him to the disadvantage of Renwood Food Products, Inc.

On cross-examination, Hall testified that the various buying groups consisted of independent stores organized together. Some items were warehoused and sold from the warehouse. Others, such as frozen foods, were sold direct to the individual stores. Renwood Food Products, Inc., billed the individual stores directly, but other frozen food distributors did not. The individual store owners were not required to buy from a certain place, but generally did buy together. Hall further stated that defendant knew a number of chain store supervisors.

On the basis of the foregoing testimony, the Court entered its decree in favor of the plaintiff, and in said decree made the following findings of fact:

"1. On or about the 11th day of September, 1947, defendant, who was then employed by plaintiff as a salesman engaged in the

wholesale distribution of frozen foods, entered into the contract marked 'Exhibit A', by which defendant agreed that upon termination of his employment he would not engage directly or indirectly in the business of distributing frozen foods or be employed by any firm engaged in the business of distributing frozen foods in competition with the plaintiff within the City of St. Louis, Missouri, St. Louis county, Missouri, Madison county, Illinois, and St. Clair county, Illinois, for a period of one (1) year from the date when his employment under the contract should cease. Defendant was originally assigned a territory which included all of the City of St. Louis and St. Louis county north of a line running generally along Market Street and Clayton Road and west of Grand Avenue. This territory was later extended to cover all of such north district as far east as the Mississippi river.

"2. On October 4, 1948, the defendant voluntarily resigned from the plaintiff's employment because he had obtained employment to manage the frozen food department of General Meat Company, a corporation, which had secured the agency for the distribution in the City of St. Louis and surrounding territory of Honor Brand Frozen Foods, a brand formerly handled by plaintiff.

"3. The written contract of employment does not provide that defendant should have the exclusive right to solicit within the territory assigned to him and the Court finds that there was no other agreement that defendant's territory should be exclusive. The territory included a much greater number of prospective accounts than defendant was ever able to call upon. During the course of defendant's employment, changes were made in his expense allowance and other matters connected with his work, but the defendant acquiesced in all of such changes and they had nothing to do with his resignation which was for the purpose of obtaining competing employment.

"4. The plaintiff was engaged in distributing frozen food products as a wholesaler throughout the City of St. Louis, St. Louis county, and Madison and St. Clair counties in the State of Illinois. The territory covered by the contract was broader than the field of the defendant's active operations as a salesman, but was reasonable under all the facts and circumstances in the case. The contract was reasonable in its terms, was not against public policy and was supported by adequate consideration."

Appellant seeks a reversal of the trial court's judgment and decree on the theory that the contract was void because the sole purpose of said contract was to prevent competition and was unreasonable, unfair, and oppressive, since it sought to prevent defendant from competing in a territory much larger than that which constituted defendant's field of activities. It is also urged that the decree should be reversed because plaintiff failed to plead and prove facts showing

irreparable damage, and because the evidence shows that plaintiff was guilty of a prior breach of the contract and, therefore, not entitled to equitable relief.

Covenants of the kind here involved, being in restraint of trade, were first regarded by the courts as contrary to public policy and hence invalid. The reason for such rule was two-fold, namely, injury to the public and injury to the employee. The restraint worked injury to the public by depriving it of the industry to which the employee was best suited, and tended to cast the employee and his family upon the public for support. It also fostered monopolies, prevented competition, and tended to raise prices. Alger v. Thacher, 19 Pick. 51, 31 Am. Dec. 119; Herreshoff v. Bontineau, (Rhode Island) 19 Atl. 712. The doctrine had its origin at a time when the field of human enterprise was limited, and each man's industrial activity was necessary to the material welfare of his community. Travel was difficult, and the conditions of the times were unfavorable to the migration of persons seeking employment. Skrainka v. Scharringhausen, 8 Mo. App. 522, 28 Col. Law Rev. 81. But, with the improved facilities of travel, and the growing ability of workers to adapt themselves to different occupations, the reason for the rule disappeared, with the result that the courts began to uphold reasonable restraints on employment on the theory that such covenants were beneficial to both parties—being beneficial to the employee for the reason that it enabled him to dispose of his services advantageously, and beneficial to the employer because it protected him against a competition which would not otherwise have existed except for the employment. Skrainka v. Scharringhausen, 8 Mo. App. 522; Gordon v. Mansfield, 84 Mo. App. 367; City Ice & Fuel Co. v. Snell, Mo. App., 57 S. W. 2d 440; City Ice & Fuel Co. v. McKee, Mo. App., 57 S. W. 2d 443; Garlich's Agency Co. v. Anderson, Mo. App., 226 S. W. 978.

Also important in the changed attitude of the courts was the realization of the importance of requiring persons who, by the solemnity of contract, had assumed certain engagements, to observe them.

The cases held that the reasonableness of the restraint was to be determined according to the particular facts of each case, taking into consideration the subject matter, the situation of the parties, the nature of the business restrained, and the extent of the restraint with reference to time and space. New England Tree Expert. Co. v. Russell, 28 N. E. 2d 997, 306 Mass. 504. As to the latter consideration, it has been generally held that the restraint must be qualified as to time and space, and not greater than is required for the protection of the person for whose benefit it is imposed. Restatement of Contracts, Sec. 515.

This brings up the question as to the extent of protection the employer is entitled to receive at the hands of the court. The early cases gave protection against any kind of competition on the part of the

employee.. Such competition was a real danger in the days of small business, and it was, at the time, thought reasonable to protect an employer against the competition of a person to whom he had imparted the knowledge and skill of his trade. But, in modern times, 'on account of the developments of the machine age and the growth of large scale production and distribution, the threat of competition by an ex-employee has ceased to be a real danger, unless it is accompanied by a knowledge of trade secrets learned by the employee during his employment, or an influence acquired by said employee over the customers of his employer. 28 Col. Law Rev. p. 81. This has led the courts to deny relief unless one of those elements is present. Herbert Morris, Ltd. v. Saxelby (1916) 1 A. C. 688; Atwood v. Lamont (1920), 3 K. B. 571; Kaumagraph Co. v. Stampgraph Co., 235 N. Y. 1, 138 N. E. 485; Clark Paper Mfg. Co. v. Stenacher, 236 N. Y. 312, 140 N. E. 708, 29 A. L. R. 1325; Molina et al., v. Baring, 56 N. Y. S. 2d 124; Menter Co. v. Brock et al., (Minn.) 180 N. W. 5b `· Gordon Supply Co. v. Galuska, 166 At. 700; Sherman v. Pfefferkorn, `35 `. E. 568, 241 Mass. 468.

Lo· ̥ ̤tᴋinson, in Herbert Morris, Ltd. v. Saxelby, supra, (l. c. 702), sumᴊ ̤arized the modern rule as follows:

'' He (employer) is undoubtedly entitled to have his interest in his trade secrets protected, such as secret processes of manufacture which may be of vast value. And that protection may be secured by restraining the employee from divulging these secrets or putting them to his own use. He is also entitled not to have his old customers by solicitation or such other means enticed away from him. But freedom from all competition per se apart from both these things, however lucrative it might be to him, he is not to be protected against. He must be prepared to encounter that even at the hands of a former employee.''

. The restrictions of the contract sought to be enforced in this case are limited as to time, namely, for a period of one year from the termination of defendant's employment. This limitation is, in our judgment, entirely reasonable under the facts and circumstances in evidence.

Defendant was employed to solicit business from the retail dealers in frozen foods in the north St. Louis territory. His duties were to call upon customers who were already on plaintiff's books, and also to secure new accounts. In carrying out these duties he would come in personal contact with the customers, and it is reasonable to believe that he would, during the term of his employment, obtain a personal knowledge of and influence over a great many of them, and would be in a position to entice them away from plaintiff in the event he should terminate his employment with plaintiff and set up business for himself or enter the employ of another.

Plaintiff, having a proprietary right in its trade connections, was well within its rights by insisting upon a restrictive covenant, effective for a reasonable time, in order that it might take steps to protect its interest by securing itself against the character of competition which defendant might offer.

Nor do we think the restrictive covenant was unreasonable and oppressive because it sought to prevent defendant from competing in a territory larger than the one which constituted the field of his activities. The test to be applied is whether the area in which the restriction is to be enforced is larger than reasonably necessary for the protection of the covenantee.

The evidence shows that plaintiff's business was co-extensive with the restricted area. Operating in that area were stores belonging to certain associations and buying groups. Defendant sold to many of these stores which were located in the north St. Louis area. He became acquainted with many of the supervisors employed by these associations who had influence beyond the area assigned to defendant. He, of course, came to know the members of these groups who operated stores in his territory. Such acquaintances could reasonably be expected to be made use of to give defendant an advantage in securing business for his new employer in the whole of the greater St. Louis area. The restriction imposed by the court was clearly justified by the evidence.

There is no merit to appellant's complaint that plaintiff failed to allege and prove facts showing irreparable damage. The facts alleged in the petition and the facts in evidence show that the damage which plaintiff will suffer by reason of a breach of contract on the part of defendant could only be estimated by conjecture. This is a sufficient showing of irreparable damage. 25 C. J. S., Damages, Sec. 2, p. 458.

Appellant's final assignment of error is that plaintiff is not entitled to relief because of prior breaches of the contract on plaintiff's part.

In support of this assignment it is urged that one of the terms of the contract was that defendant would have the exclusive right to sell plaintiff's products in the north St. Louis territory, and that plaintiff violated this provision by assigning Mr. Gagnepain to that territory.

Defendant testified that he was told he would have the exclusive right to the north St. Louis territory. Mr. Hall, Vice-President of Renwood Food Products, Inc., denied this. It also appears from plaintiff's evidence that there were 600 stores in the north St. Louis territory selling frozen foods, and in all about 2500 grocery stores in that area which were prospective customers. Defendant estimated the dealers in frozen food in his territory as 250. He did not estimate the number of prospective customers.

Considering this testimony, we are inclined to believe the testimony of Mr. Hall—that defendant was not given exclusive rights in the

territory assigned to him. It is not reasonable to suppose that a company engaged in exploiting a trade territory containing so many customers, and prospective customers, would assign exclusive rights of that territory to one man, when it is apparent that it would be physically impossible for such person to adequately cover the territory. We find that plaintiff did not breach the contract in the respects claimed.

It is next urged that plaintiff violated the contract by changing the car allowance from five cents a mile to $50 per month. We find from the evidence that defendant consented to this change.

Finally, it is urged that plaintiff required defendant to work six days a week, when the contract called for five days a week and one-half day additional every third or fourth week. We find the evidence is not sufficient to support this contention.

It is our conclusion that the plaintiff was entitled to the equitable relief sought, and that the restrictions imposed on the defendant in the decree are clearly justified by the contract and the evidence in this case. The judgment appealed from is affirmed. *Hughes* and *McCullen, JJ.* concur.