Floyd L. WEAVER and Lola Weaver, Plaintiffs-Appellants,

v.

Gerald V. JORDAN and Carmetta M. Jordan, Defendants-Respondents.

No. 8110.

Springfield Court of Appeals.

Missouri.

Nov. 5, 1962.

Motion for Rehearing Overruled Nov. 27, 1962.

Richart, Titus & Martin, Joplin, for appellants.

William H. Burden, Joplin, for respondents.

McDOWELL, Judge.

This appeal is from a judgment in favor of the defendants on their counterclaim for $5,000 damages for violation of a restrictive covenant contained in the contract of sale of Weaver's Restaurant by plaintiffs to defendants and in enjoining plaintiffs from engaging in the restaurant business either as owners, co-owners, employees or agents and enjoining them from leasing their real estate to anyone for restaurant purposes.

On May 1, 1959, plaintiffs and the defendants entered into a written contract for the sale and purchase of all the equipment, fixtures, stock and merchandise located in Weaver's Restaurant at 529 Range Line in Joplin. This lease agreement is in evidence as defendants' exhibit (I). The gross sale and purchase price was $28,000 paid; $15,000 in cash, $3,000 in Texas real estate, and $10,000 by a promissory note executed by the defendants to plaintiffs payable $300 per month and secured by chattel mortgage on the property conveyed by said contract. The real estate upon which the restaurant is located was owned by Mr. and Mrs. Smith and leased to plaintiffs. By the terms of the contract of sale plaintiffs assigned all their interest in this lease to defendants.

Defendants entered into possession of the Weaver's Restaurant May 3, 1959, and paid the $300 monthly payments on the note sued on herein up to and including October 1, 1960, at which time they refused to make further payments for the reason that plaintiffs had violated the restrictive covenant contained in the sales contract.

On November 14, 1960, plaintiffs filed suit in the Circuit Court of Jasper County asking the court to decree foreclosure on the chattel mortgage given by defendants to secure the payment of their $10,000 promissory note and asked that the court order the property (described in said chattel mortgage) sold and the proceeds applied to the indebtedness due plaintiffs and for any deficiency if the mortgaged property did not bring sufficient funds to fully satisfy the debt and costs, and to decree the residue to be levied on other goods, chattels, lands and tenements of defendants.

Defendants filed answer and counterclaim. They admitted execution of the note and chattel mortgage and payments up to October 1, 1960.

In count I of their counterclaim they alleged, in part, that plaintiffs had violated their May 1, 1959, sales contract; that under the terms and conditions of said

contract plaintiffs sold to the defendants the good will of said business and agreed with them that they would not enter into the restaurant or any competitive food business within five miles of the location of Weaver's Restaurant for five years.

That during the year 1959, following the sale of said business, plaintiffs purchased a lot on Range Line, approximately three blocks south of Weaver's Restaurant and erected a building thereon for the purpose of manufacturing and selling candy. This place was advertised as "Lee Weaver's Candy Shop" in an effort to attract their former acquaintances and customers and operated this business for a few months; that during the latter part of the summer of 1960 plaintiffs remodeled said building, purchased and installed restaurant fixtures, and on or about October 13th, opened said business designating it as the "Colonel's Pancake House", and have since that time operated said restaurant in direct competition with the defendants' business and in violation of the conditions of said contract; that as a direct result of the opening and operating of said restaurant business by plaintiffs they have lost all the good will that went with the Weaver's Restaurant; that the volume of their sales has greatly decreased, making it unprofitable for them to continue in business and to compete with plaintiffs, and that as a direct result of said acts, defendants were forced out of business and to mitigate their loss and damages leased said business to Howard and Margaret McCorkle; that they have sustained damages to their business as a going concern and in addition to the damages they have sustained as a result of the decline in the volume of their business in the amount of $5,000, its market value is now worth $10,000 less than before plaintiffs entered into a competitive business with them.

Count II of the counterclaim prayed that plaintiffs be enjoined and restrained from in any manner in engaging in the business of operating a restaurant at 842 Range Line, as owners, co-owners, employees or agents and from leasing said premises to any person, firm or corporation for the purpose of conducting a cafe, restaurant or any other competitive business.

Pursuant to plaintiffs' motion for judgment on the pleadings, the court, on June 6, 1961, gave plaintiffs an interlocutory judgment for $5,516.35. The cause was then tried only on the counterclaims of defendants, by the court without a jury.

The gravamen of the issues lies in the following paragraph of the aforementioned contract:

"It is further understood and agreed that the Sellers are selling the good will that goes with the operation of said business and agree with the Buyers that they will not enter into the restaurant or any competitive food business within five miles of the location of the Weaver's Restaurant within a period of five years".

The facts are undisputed that approximately three months after plaintiffs sold Weaver's Restaurant to the defendants, plaintiffs purchased real estate located at 842 Range Line, Joplin, Missouri, for a sum of $12,000. Between August, 1959, and December 15, 1959, plaintiffs had a building erected on this property by the Parrish Construction Company at a cost of $20,000, and it is about three blocks south of Weaver's Restaurant. Plaintiffs designed the building for a candy business and operated it as "Lee Weaver's Candy Store".

In the summer of 1960 plaintiffs remodeled their place of business at 842 Range Line for the purpose of putting in a pancake house and purchased all the restaurant equipment necessary for the operation of a business known as "Colonel's Pancake House". Thereafter, they entered into a written lease of said premises with Charles and Helen Parrish for a period of one year beginning October 17, 1960, with option to renew the lease for additional years. This lease is in evidence as plaintiffs' exhibit (B). It was determinable by either party upon 90 days notice. The rent reserve was $500 per month plus 80% of all charges for

telephone, water, gas and electrical services and plus 10% of gross receipts realized by the Parrishes in the operation of any business on the property.

Plaintiffs (landlords) agreed at their expense to:

(a) Furnish the Parrishes with telephone, water, gas and electrical utility services;

(b) To remodel the leased premises to Parrishes' specifications at cost to plaintiffs not exceeding $3500.

(c) Furnish the Parrishes all cafe fixtures and equipment specified and required by the Parrishes.

4. Plaintiffs reserved unto themselves so much of the demised premises as they would reasonably require to make, display and sell any candies which they chose to manufacture, buy and sell.

Gerald V. Jordan testified that he had always been in the restaurant business; that at the time, and prior to the contract of lease of Weaver's Restaurant, he owned and operated a motel located at 1001 Range Line, some three blocks south of the Weaver Restaurant; that just prior to the lease between the parties herein he was considering planning another restaurant in the vicinity of 7th and 8th Range Line; that he and the Weavers were good friends and that he had "palled around" with Mr. Weaver prior to the purchase of the Weaver's Restaurant and that Weaver wanted to sell the business to defendants; that he realized that if he put in a new restaurant it would split Weavers' business in half; that he considered the headaches it would take to build a place and get it set up; that another restaurant in that location would divide the business too much and, as a result of this thinking, he negotiated with the Weavers about two months before they finally entered into a contract of sale for the restaurant. He testified that he and his wife looked the place over and figured the equipment was worth $10,000 or $12,-000; that Weavers had made some improvements on the building, which he valued at from $5,000 to $8,000; that the full purchase price agreed upon was $28,000; and the difference in the value of the personal property purchased was what he paid for the established business; that Weavers had a very nice business, which, Weaver admitted, he had operated about a year and a half prior to the sale. He stated that Weavers had an understanding with the motels around the business that they would send their business to this restaurant because the Weavers furnished newspapers to all the motels.

Mrs. Jordan testified that she and her husband had been in the restaurant business since 1944 and that from her experience and knowledge she had an idea of the value of restaurant equipment; that the equipment in the Weaner's Restaurant was worth approximately $12,000 and that the improvements which had been made on the building were worth from $8,000 to $10,000. She testified that, based on these estimates, they entered into the contract of purchase with plaintiffs (which is in evidence as defendants' exhibit I); that the purchase price was $28,000.

The evidence is that at the time plaintiffs sold the Weaver's Restaurant to the defendants they were operating under a lease for the building which belonged to Bob Smith. Mrs. Jordan testified that after they entered into possession of the restaurant they obtained a new lease on the building from Mr. Smith at a monthly rental of $100; that this lease has not been assigned and defendants still pay the rent; that later they leased the equipment in the building to Mr. and Mrs. McCorkle for $150 a month plus $100 per month for the rent which they pay to Mr. Smith. She stated that at the time they took possession of the restaurant the volume of the business averaged from $8,000 to $10,000 a month; that the Weavers never advertised the business while they operated it, except to deliver papers to the motels; that the majority of the business came from tourists and motels;

that there were some local customers. She said that at the time they purchased the business the closest restaurant was 71 Restaurant at 17th Street.

At the time the Colonel's Pancake House was opened, two large signs erected on the building stated "Lee Weaver's Candies", and there was a display advertisement appearing in the local papers, which is in evidence as exhibits 4 and 6, announcing the opening of the Pancake House stating "formerly Lee Weaver's Candies". Mrs. Jordan testified that after the Pancake House opened, she noticed that the business of the Weaver's Restaurant went down, especially the morning breakfast and lunch business; that the breakfast business was cut practically one-half; it had been running from $60 to $100 a day but dropped to around $30. She testified that Henry's Cafe across the street from their restaurant does not serve breakfast or lunch but has a cocktail lounge and serves the evening meal. She stated she did not consent or authorize plaintiffs' opening a competitive business.

She testified the Weavers operated a candy business exclusively until sometime in September, 1960, at which time the Parrish Construction Company remodeled the interior of said building at a cost of over $4,000 in order to convert it into a restaurant.

Mr. Weaver testified that they were required to put in an extra restroom, install a partition in the kitchen, convert the cooling room into a restroom and a part of the kitchen into a dining area; that they purchased all the fixtures, equipment, dishes and cooking equipment for the restaurant from Joe Harding about October 22, 1960, at a cost of $2,127.05. His testimony is that no one else owned any of the equipment located in said building; that he discussed with Jessie Perry of 3201 East 13th Street, in August or September, 1960, the possibility of leasing the building to her; that a rough draft lease was prepared but not executed. Jessie Perry formerly was employed at Weaver's Restaurant while they operated it and is now employed at Colonel's Pancake House as a waitress.

Mr. Jordan testified that in March, 1960, Weavers asked him if he would give permission to install a pancake house in place of the candy store and offered to pay him a percentage of the business; that they talked to him about three or four times; that Mrs. Weaver asked him about the matter again and he told her that he had talked it over with his wife and she said "absolutely no". Witness said that on a prior occasion Weaver showed him newspaper clippings and magazine articles about the pancake business. He stated that on another occasion he was in Weaver's place of business and Mrs. Weaver became angry when he refused to agree to plaintiffs' opening the Pancake House and stated she wasn't going to sit there and lose their candy business and do nothing about it; that some ten days later Weaver came to his place of business and apologized for his wife's statement and said they had decided to give up the pancake business and manufacture pralines and put them in business places for sale; that this was about the last of April. Jordan testified that he permitted these pralines to be placed in his restaurant until the Pancake House opened. He testified he had another conversation with Mr. and Mrs. Weaver after they closed the candy store and were remodeling, three or four weeks before the Pancake House opened; that they asked permission to open a pancake house, and offered him a commission or percentage of the business. He stated plaintiff said, "Well, why don't you take the whole thing over and run it yourself, because the contract—we haven't got nobody to sign the contract yet, * * * You can still have the contract if you want it". Witness stated that plaintiffs did not have any contract prepared but mentioned the fact that they had a contract drawn up and no one had signed it and that defendants could have it if they wanted it; that they declined the offer because of the recession at that time.

The evidence is that the Pancake House grossed from $3,000 to $4,000 a month. Mr. Jordan testified that there was a difference in the sales of the Weaver's Restaurant after the Pancake House opened; that he noticed a change in the gross receipts, which went down. He stated they went down from $30 to $50 a day. He testified that when they bought the restaurant it had an established business; that there were certain people who came in about every day; that after the Pancake House opened he noticed a considerable change in that particular class of people that came in; that people would make inquiries there on an average of two or three a day as to where the Weavers were. He said he was certain Weavers were going to take all of his business away from him and that he was going to have to do something about it so he advertised the restaurant for sale but was unable to sell it. He testified he had to lease the same for $150 a month to Mr. and Mrs. Howard McCorkle; that they still own all of the equipment in said restaurant. The lease to the McCorkles was dated December 6, 1960, and contained an option to buy the business for $20,000. He identified exhibit 2, which shows the gross receipts of his restaurant and is as follows:

## "GROSS RECEIPTS — SCHEDULE A.

"1959

| | | | | |
|---|---|---|---|---|
| May | $ 8,192.88 | | January | $ 4,373.09 |
| June | 10,932.59 | | February | 3,560.27 |
| July | 11,393.95 | | March | 4,095.37 |
| August | 11,350.77 | | April | 5,164.79 |
| September | 7,442.84 | | May | 5,104.09 |
| October | 6,578.52 | | June | 7,821.03 |
| November | 5,305.58 | | July | 7,546.16 |
| December | 5,559.66 | | August | 8,968.06 |
| | | | September | 5,413.97 |
| | | | October | 4,958.92 |
| | | | November | 3,390.91 |
| | | | December 1 to 6, Inclusive | 487.24 |
| | $66,756.79 | | GROSS RECEIPTS | $60,883.90" |

The witness stated that Henry's Restaurant, directly across the street from Weaver's Restaurant, is a night club with a bar, which opens at 5:00 o'clock in the evening. He stated that the best motel was across the street from Colonel's Pancake House and another one next door; that he got considerable breakfast business from these motels; that there were two or three other motels around 7th and Range Line which do not have their own eating facilities; that in order to induce business from these motels he furnished newspapers to five different ones; that Weaver's Restaurant got 90% of its business out of the motels. He stated that after the Pancake House opened the business from these motels just quit coming; that this was reflected in his cash receipts. He stated he tried to sell his restaurant for $20,000 but got no offers; that there was a general decline in business along the highway; that it was the beginning of the recession that everyone knows we had; that business was going down before Colonel's Pancake House opened but this was not the reason he wanted to sell; that the help situation was bad and he could not operate the business by himself. He testified that they kept no receipts from breakfast, lunch or dinner but read the cash register tape after every meal.

Mrs. Helen Parrish testified for plaintiffs that she and her husband had the Parrish Construction Company and the Colonel's Pancake House; that this company did general contracting and she was its secretary; that she had regular hours from 9:00 in the morning until 5:00 in the evening; that she took care of the books. She testified this business had about 15 employees and at the present time they probably had 8 or 10 building projects; that they did business in New Mexico, Texas, Arkansas, Louisiana, Oklahoma and Missouri and had done business in Kansas; that they also had an office in Dallas. She said her husband was not served with process as a witness because he was in Shreveport, Louisiana; that he was out of town quite a bit. She stated that in addition to these interests they were a part of Southwest Enterprise, Inc., a development company; that this company was building a bowling alley at 7th and Range Line and it has 10 employees at this time. She also stated they had a job at 2401 New Hampshire and one on Newman Road and in Shreveport; that she and her husband were also interested in the Bell Land Company, a development company, which owns ground in Neosho. She stated she had never worked in a cafe but worked in a drugstore in Pittsburg, Kansas, which served light lunches, when she was a girl. She testified that she married Mr. Parrish in September, 1948; that he had not been in the restaurant business at any time during their marriage until he took an interest in Colonel's Pancake House. She stated she did not know how long they had known the Weavers, but met them first when they purchased one of their houses at Monroe, probably in 1955 or 1956; that they built the candy store for them where Colonel's Pancake House is now located; that they did some remodeling for them at Weaver's Restaurant; that neither she nor her husband own any equipment in the Pancake House, which has around 10 employees.

She testified Jessie Perry is employed at the Pancake House; that she thought she had been with the Weavers at Weaver's Restaurant. She stated the Pancake House has about six waitresses; that Mr. Weaver is cashier and host and Jessie Perry is in charge in the morning when she is not there; that she was in the Pancake House about an hour and half each morning; that she takes cash and cleans off the tables if necessary, orders some produce; that the business opens at 6:00 o'clock A.M. and she gets there around 8:00 o'clock.

She stated she keeps some of the books for the Pancake House and the remainder is done by Jim Muskrat; that she did not know how much business the Pancake House did in August as she had not asked Muskrat to make a financial statement for several months; that she does not keep the records herself. She makes out the payrolls, keeps the individual earning records, writes the checks for bills but that Muskrat reconciles the bank statements and does the actual work on the registers. She testified they have not made any percentage payments and will not do so until the end of the year; that Weavers still owe them a balance on remodeling the Pancake House; that she and her husband hire and fire employees; that she pays the Weavers their salaries, which come out of the Pancake House account; that the Weavers have no interest in the business other than employees. She stated that Jessie Perry orders and pays for the food. She testified that the Weavers have a candy case out there and a right to sell candy; that the remodeling of the cafe was done in accordance with the Parrishes' specifications; that the Weavers make the repairs. She said Henry's Cafe pays on a percentage basis to Southwest Enterprises; that this company operates a pool hall. She states she has three children, 4, 6, and 8 years of age.

Joe Harding testified that he furnished the equipment for the fixtures for the Colonel's Pancake House; that part of the equipment was outdated. He said they had made some repairs which cost $40 and was charged to Weavers. He testified that from his ex-

perience in handling restaurant equipment, he thinks 10% of the gross profit is a reasonable charge for rent.

On cross examination he stated he could not tell how much rent this business could pay percentage wise of the gross income as there were too many factors involved.

Haskell Trusty, a real estate agent, testified that he operated a drive-in restaurant; that he had been in this business about twelve years; that based on his experience in buying and selling restaurants for himself and others, a business can safely pay a rental from its gross receipts on a percentage basis of 5%.

In our opinion we will designate appellants as plaintiffs and respondents as defendants, the position the parties occupied in the lower court.

■ In our review of this non-jury case we review the record de novo and determine the credibility, weight and value of the testimony and evidence in the case, but in doing so we give due deference to the trial court's findings as evidenced by the result reached, and the fact that he heard the testimony and was able to observe the witnesses and thereby judge their credibility. Furthermore, we are admonished by § 510.310 RSMo 1959, V.A.M.S. that "the judgment shall not be set aside unless clearly erroneous". Williamson v. Burnett, Mo.Sup., 345 S.W.2d 80, 81 [1, 2]; Anderson v. Abernathy, Mo.Sup., 339 S.W.2d 817, 818 [1]; State v. Anderson, Mo.Sup., 242 S.W.2d 66, 70 [1].

Plaintiffs urge error on the part of the trial court in overruling their motions for judgment and rendering judgment for $5,000 in favor of defendants and in restraining plaintiffs because:

"A restrictive covenant limiting the exercise of the pursuit of an occupation is in restraint of trade and should be strictly construed."

To support this alleged error Prentice v. Rowe, Mo.App., 324 S.W.2d 457, is cited.

This is a decision by our court. The action was for injunction for enforcement of restrictive covenants in a contract for the artificial insemination of cattle. The judgment was for plaintiffs and defendant appealed. In this case we made an exhaustive study of restrictive clauses in contracts. On page 461 we stated the rule thus:

"To be reasonable, the restraint usually must be qualified as to both time and area and must be no greater than fairly required for protection of the person for whose benefit it is imposed. Renwood Food Products v. Schaefer, 240 Mo.App. 939, 951, 223 S.W.2d 144, 151. * * *

"* * * A restrictive covenant limiting an individual in the exercise or pursuit of his occupation is in restraint of trade [Corbin on Contracts, Vol. 6, § 1392, loc. cit. 509; Restatement of Contracts, Vol. 2, § 513, p. 987], and the burden of "establishing its validity, by showing that it is reasonable, rests upon the party claiming its benefit." (See authorities cited.)

The cases hold that reasonableness of the restraint was to be determined according to the facts in each case, taking into consideration the subject matter, the situation of the parties, the nature of the business restrained, and the extent of the restraint with reference to time and place. Renwood Food Products v. Schaefer, 240 Mo.App. 939, 223 S.W.2d 144, 151.

In Montgomery v. Getty, Mo.App., 284 S.W.2d 313, this court held that contracts in restraint of trade are regarded with suspicion as the usual effect is to create monopoly, and before they will be enforced, it should clearly appear that no monopoly will be created, that enforcement will not prejudice public, that contract is reasonable as to time, space and person, not oppressive or injurious, that contract is founded on good consideration, and that its enforcement will be useful and beneficial to promisee.

Hessel v. Hill, Mo.App., 38 S.W.2d 490, involved facts similar to the facts in the instant case. There was a contract for sale

of an undertaking business with a restrictive clause prohibiting sellers re-entering business within certain territory and conveyed good will and sellers' right of competition in the territory named. On page 492 [1, 2] the court stated:

"* * * We think it obvious that the plaintiff purchased and defendant sold not only the physical assets but the good will of the business, together with defendant's right of competition, to the full extent of the territory named. The consideration paid, the character of the business, the situation of the parties, their manifest intention, and the express language of the covenant lead only to this conclusion. It was the evident purpose of the restrictive clause to protect the purchaser from competition in the business which he was buying. It is worthy of note that by the express terms of the contract plaintiff purchased, and defendant sold, 'his undertaking business.' Defendant agreed he would not re-enter said business within a stated time and area. The agreement not to re-enter the undertaking business is a covenant which forbids defendant to re-engage in or pursue the vocation of an undertaker, and is not limited to the restricted meaning of re-establishing or re-opening an office or place of business within the prescribed limits."

█ We think it is obvious from the restrictive clause contained in the contract of sale in the instant case that defendants purchased and plaintiffs sold not only the physical assets but the good will of the business, together with plaintiffs' right of competition to the full extent of the territory named. The consideration paid, the character of the business, the situation of the parties, their manifest intention, and the express language of the covenant lead only to this conclusion. It was the evident purpose of the restrictive clause to protect the purchasers from competition of the business which they were buying. It is worthy of note that by the express terms of the contract, defendants purchased, and plaintiffs sold, their restaurant business. Plaintiffs

agreed that they would not enter into the restaurant or any competitive food business within five miles of the location of the Weaver's Restaurant within a period of five years. We find that this restrictive covenant is not restricted to the meaning that plaintiffs must actually own and wholly conduct such a business but that when they, within three months after entering the sales contract with defendants, bought property on the same street, within three blocks of the business sold, erected a $20,000 building, which could be easily converted into the restaurant business and did actually, within the time limit provided in the covenant, decide to use the building for the operation of Colonel's Pancake House; that even though they pretended to lease this property to the Parrishes, the very terms of the contract reserving a rent of $500 a month, buying and owning all of the equipment used in the restaurant, serving as employees for a stated salary and reserving 10% of the gross receipts, would justify the trial court in finding that plaintiffs were actually engaged in and operating a restaurant business in violation of the restrictive clause. This conclusion is further supported by the acts and conduct of plaintiffs prior to the opening of the Pancake House. The fact that they first consulted defendants about being released from their restrictive covenant in order to open a pancake house; that at this time they showed defendants clippings from papers and magazines showing the feasibility of going into such business and further offering defendants a part of the gross receipts to permit the opening of the Pancake House and then urging defendants to sign a lease and operate such business is strong evidence that the scheme of violating this restrictive clause by opening the Pancake House was conceived by plaintiffs long before the purported lease between plaintiffs and the Parrishes.

There is further evidence to support the finding of the trial court that plaintiffs, by opening the Pancake House breached the restrictive covenant. The Parrishes were engaged in the construction business, doing

business in many states; they were friends of plaintiffs; they had remodeled the Weaver's Restaurant before plaintiffs opened that business, they erected the building in which the Pancake House was located, they had never been interested in, or connected with, the operation of restaurants. Mrs. Parrish was the bookkeeper for the various businesses of the Parrish Construction Company. She only spent an hour and a half a day in the operation of the Pancake House. Mr. Parrish actually had nothing to do with the business. We think the trial court would have been justified in basing his opinion of liability of plaintiffs for the breach of this restrictive clause because the business was actually owned and operated by plaintiffs.

■ Equity is reluctant to permit a wrong to be suffered without remedy. It seeks to do justice and is not bound by strict common law rules or the absence of precedents. It looks to the substance rather than the form and will not sanction an unconscionable result merely because it may have been brought about by means which simulate legality. And once rightfully possessed of a case it will not relinquish it short of doing complete justice. Merrick v. Stephens, Mo.App., 337 S.W.2d 713, 719 [5, 6]; Roach v. Kohn, Mo.Sup., 235 S.W.2d 284, 288.

We cannot agree with the points relied on by plaintiffs under the second alleged error. We think it could make no difference whether plaintiffs owned the property which they attempted to lease to the Parrishes, known as the Colonel's Pancake House, at the time they sold to Weaver's Restaurant. We do not agree with plaintiffs' contention that the covenant did not prohibit plaintiffs from accepting employment in a competing business. In fact, we think the evidence in the instant case shows much more than merely employment by plaintiffs in the Pancake House. It shows they were actually receiving practically all the income from that business and were actually operating the same.

Under the evidence we sustain the trial court's judgment in awarding defendants an injunction against the plaintiffs.

■ The most serious question presented for our decision is the judgment of $5,000 damages which plaintiffs contend was based on pure guess work and speculation. We agree with plaintiffs that the burden of proving pecuniary damages was on defendants. Pecuniary damages is not presumed. The burden of proving such damages and that they resulted from the wrongful act of plaintiffs is on defendants claiming such damages.

■ In 25 C.J.S. Damages § 144, p. 788, the law is stated: " * * * a presumption of at least nominal damage follows from proof of a legal wrong. However, the amount and items of pecuniary damage are not presumed, but must be proved; and if there is no evidence as to the extent of the pecuniary loss there can be no recovery of substantial damages, at least where the elements of damage are such as to be susceptible of pecuniary admeasurement." Newton Burial Park v. Davis, Mo.App., 78 S.W.2d 150.

■ The elements of damage, shown by the evidence in the instant case, consists first, that the consideration for the good will of the business sold by plaintiffs to defendants was the difference between $22,000 and $28,000. Defendants testified that this good will was completely destroyed by plaintiffs entering into the restaurant business known as Colonel's Pancake House, just three blocks from the Weaver's Restaurant. It will be noted that while exhibit 2, offered by defendants, showing the monthly income of the Weaver's Restaurant during the term of operation by defendants, did show that the business declined in the latter part of said operation, it is plaintiffs' contention that this decline in business was due to a depression. This argument does not have much weight when we compare the sales of the Weaver's Restaurant with the gross

sales of the Pancake House from the date it started operating, to-wit, October 22, 1960.

The gross sales of the Pancake House for the 7⅓ months of operation, as shown by plaintiffs' answer to interrogatory No. 9, were as follows:

"10–22 to 10–30–60     $ 1,104.05
 11– 1 to 11–30–60       3,200.40
 12– 1 to 12–31–60       3,337.55
  1– 1 to  1–30–61       3,696.15
  2– 1 to  2–28–61       3,502.41
  3– 1 to  3–31–61       4,389.57
  4– 1 to  4–30–61       4,491.91
  5– 1 to  5–31–61       4,832.29
                       $ 28,554.33"

Defendants offered evidence that plaintiffs, especially Mr. Weaver, had been operating the Weaver's Restaurant for some time prior to the sale in question, (Weaver testified about a year and a half); that he had been in other businesses in Joplin, particularly one in which he operated a Bar for four years. Mr. Weaver admits that he had many friends in Joplin. The advertisements in the papers and the signs placed on the building connects Weaver's name with the Pancake House attracting business that formerly went to Weaver's Restaurant. Mrs. Jordan testified that the breakfast business was cut practically in half after the Pancake House opened; that it had been running from $60 to $100 a day and was cut to $30 a day. Mr. Jordan testified that after the Pancake House opened, he noticed a decline of from $30 to $50 a day in the gross receipts of the business. We think this testimony is supported strongly by exhibit 2 showing the monthly gross receipts of Weaver's Restaurant during the time it was operated by defendants, before and after the opening of the Pancake House. The evidence fully supports the judgment of the trial court in finding that plaintiffs breached the restrictive covenant contained in the sale of the Weaver's Restaurant and reduced the business of that restaurant to such an extent that defendants could not afford to operate it and thereby destroyed the good will of the business. The evidence is that they leased the restaurant after opening the Pancake House for $150 per month plus the amount of the rent.

We find that the evidence shows that plaintiffs purposely entered into a scheme to violate their restrictive clause in their contract with the defendants. The terms of their lease contract to Parrishes show that they reserved as rent $500 per month plus 10% of the gross receipts, which would amount to practically $400 per month and plus the further fact that both Mr. and Mrs. Weaver, plaintiffs, were employed in the restaurant. Mrs. Weaver operated the cash register and waited on tables at a salary of $35 per week and Mr. Weaver was host and cashier of the business at a salary of $40 a week which would add $75 to the $900 a month that they were receiving out of this business. Defendants' evidence is that the profit in operating a restaurant is approximately 25% of the gross sales. Reasoning from that testimony, plaintiffs were receiving all the profits of the Pancake House. Each of the plaintiffs was working seven days a week, eight hours a day.

The evidence shows that Mrs. Parrish worked an hour and a half each day and that Mr. Parrish did nothing. In fact, the evidence shows that the Colonel's Pancake House was owned and operated by plaintiffs; that they received practically the total income; that the lease contract from plaintiffs to Parrishes was a sham under which they undertook to get around the terms of their contract with the defendants.

We think there is sufficient proof as to the items of damage sustained by the defendants because of plaintiffs' breach of the restrictive covenant to justify the court in rendering judgment for damages in the sum of $5,000.

Judgment affirmed.

RUARK, P. J., concurs in separate opinion.

STONE, J., concurs in result.

RUARK, Presiding Judge (concurring).

I concur in what I think is an extremely close case on the question of damages. I have no doubt that plaintiffs did, in sneaky and indirect fashion, what they had contracted not to do. There exists the possibility that the end obviously sought by the court could have been reached by a defense to plaintiffs' claim on the ground of partial failure of consideration; but apparently such defense was not offered and the judgment for plaintiffs is not questioned by the defendants.

In any case involving loss of business due to violation of a contract not to interfere with good will, the amount of loss or damage is, in its very nature, hard to prove with exact certainty, and must necessarily present a somewhat speculative aspect; but no more so, I think, than that in those cases which involve, for instance, damages for pain and suffering, loss of future earnings, etc. We entrust a jury with the right and duty to exercise some judgment and make determination. Surely an experienced trial judge should have the same trust in law and in equity.

The evidence does show that following the establishing of the "Colonel's Pancake House," the old customers of the restaurant quit coming to "Weaver's Cafe." Despite talk of recession and new restaurants down the road, the fact remains that, as the gross receipts of Weaver's Cafe *went down,* the gross receipts of the competing pancake house *went up* in somewhat related or corresponding (but opposite) manner. And this pancake house was, in effect, being operated by Weaver and his wife who had sold their "good will" to the defendant.

The evidence showed a fairly definite value for the "good will" at the time the business was sold. In my opinion, when the wrongful competition of plaintiffs by the thinly disguised operation of a competing business so lowered the value of the business sold as to make it unprofitable to continue to operate the same, then this amounted to a complete destruction of the good will so sold and the court would have been justified in rendering judgment for any amount within the limits of the value of such as shown by the evidence. The case was before a court of equity. I am not inclined to question too closely how such court moved to accomplish its result. Therefore, I concur.