William C. ALLDREDGE, Respondent,

v.

TWENTY–FIVE THIRTY–TWO BROAD-
WAY CORPORATION, Appellant.
No. KCD 26403.

Missouri Court of Appeals,
Kansas City District.

May 6, 1974.

Robert B. Olsen, Kansas City, for appellant.

Frederick Beihl, Kansas City, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

This is an appeal from a judgment for $6,974.48 in favor of the respondent and against the appellant in a court-tried case based upon a written contract of employment and involving respondent's claim for "termination payment" thereunder. The court below was not requested to, and did not, make any specific findings of fact or conclusions of law nor file a written opinion as contemplated by Rule 73.01(b), V.A.M.R., but entered a general verdict and judgment in favor of the plaintiff-employee. All fact issues shall, therefore, be "deemed found in accordance with the result reached." Rule 73.01(b). Our review is upon both the law and the evidence as in suits of an equitable nature, and the judgment below shall not be set aside unless clearly erroneous, and we give due regard to the superior opportunity of the trial court to judge the credibility of the witnesses. Rule 73.01(d). Coach House of Ward Parkway, Inc. v. Ward Parkway Shops, Inc., 471 S.W.2d 464, 465 (Mo.1971); Mission Insurance Co. v. Ward, 487 S.W.2d 449, 451 (Mo. banc 1972).

We have carefully reviewed the transcript of the evidence, the exhibits and the briefs of the parties and find that there is very little factual dispute in this case. The defendant offered no evidence. This case, in essence, resolves to the narrow point of the interpretation to be given an employment contract between the parties, which contract is unambiguous and clear. We have concluded that the court below reached the right result and we affirm.

The essential factual background of this case may be summarized as follows:

In 1930, the plaintiff began his employment with the Seavey and Flarsheim Brokerage Company, a Missouri corporation engaged in the grocery brokerage business. Upon his promotion to the position of Manager of the Merchandise Department on November 26, 1951, plaintiff and his employer entered into the written employment contract here involved. Such contract was to "remain in force and effect during the pleasure of both parties" and could be terminated by written notice.

In addition to the monthly salary specified in the agreement, the contract provided for "additional compensation" to be paid upon the termination of the contract. In the event the company terminated the agreement, such sum was to be 10% of the compensation paid to Alldredge in the previous twelve months plus 1% of the total compensation paid to Alldredge during his total period of employment by the company. In the event Alldredge terminated the agreement, the sum was to be five per cent (5%) of the compensation paid in the previous twelve months plus one-half of one per cent (½%) of the compensation paid to Alldredge during his employment by the company. The contract provided, however, that the payment of such additional compensation was to be conditioned upon Alldredge's compliance with certain "restrictive provisions".

The "restrictive provisions" were to the effect that after termination by either party, Alldredge would not engage directly or indirectly in the grocery brokerage business in competition with the company-employer. These provisions read as follows:

"6. In the event Alldredge shall terminate this Agreement, he shall not and expressly agrees that he will not, for a period of four (4) years from the date of such termination, in the States of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Minnesota, Iowa, Missouri, Arkansas, Wisconsin, Illinois, or in any other state of the United States in which the Company may at the time be operating:

(a) engage directly or indirectly in his own account or name, or in the account or name of another person or concern, in the grocery brokerage business or in any phase thereof (i.e. the brokerage of such commodities handled or represented by the Company now or at any time hereafter up to the date of termination);

(b) render service or lend his name directly or indirectly to any other person or concern engaged in the grocery brokerage business or any phase thereof as above defined;

(c) directly or indirectly act as a sales representative for any prinicipal now, or at any time hereafter to the date of such termination, represented by the Company, or for any competitor of any such principal.

7. If this Agreement shall be terminated by the Company then Alldredge agrees that he shall not and will not for a period of two (2) years from the date of such termination in any of the territory described in paragraph 6 do any of the acts or things he has agreed he shall not do in subparagraphs (a), (b) and (c) of said paragraph 6."

In 1966, the Seavey and Flarsheim Brokerage Company entered into negotiation with The Hoosier Brokerage Corporation whereby Hoosier was to purchase all of the assets of Seavey except its cash and accounts receivable. In addition to the purchase of the physical assets, Hoosier purchased the good will and the exclusive right to use the name "Seavey and Flarsheim". The selling company (plaintiff's employer) took the name "Twenty-Five Thirty-Two Broadway Corporation" and went into an entirely different line of business. The buying company took the name "Seavey and Flarsheim Brokerage Company, *Inc.*" and continued in the grocery brokerage business.

The uncontroverted testimony of the plaintiff was to the effect that as a shareholder in the corporation, he received written notice of a shareholders' meeting to be held in January of 1966 for the purpose of approving the proposed sale to Hoosier; that he did not attend the meeting; and that he had no knowledge of the detailed terms of the sale contract between his employer and Hoosier. At this time, he was Assistant to the President and Manager of the St. Louis office. He further testified that he did know that the sale was to take place by the end of February, 1966 and that he wrote to the President of the cor-

poration, Louis Flarsheim, to inquire about the additional compensation due upon termination. Plaintiff's Exhibit No. 3, a carbon copy of the letter, was admitted into evidence without objection, and reads as follows:

"To Mr. Louis Flarsheim From W. C. Alldredge Date 2–17–66

Dear Louis:

Since Seavey & Flarsheim Brokerage Company is terminating my contract, I expect to be paid in accordance with the terms of that contract.

The figures that Mr. Blackburn gave me on his recent visit to St. Louis were erroneous. Please have Mr. Rice correct these figures, and send me a check as soon as possible.

Yours very truly,
W. C. Alldredge

cc: Mr. Woodson
WCA/jw"

Plaintiff testified that he received the following "Memo" (Plaintiff's Exhibit No. 4, received into evidence without objection) as a reply to his letter:

"March 1, 1966

Memo

William C. Alldredge termination pay under his employment agreement.

Salary for full time employeed (sic)
by company
Through february (sic) 28, 1966     $517,447.63
Salary for his services for past 12 months     $ 18,000.00"

Under date of March 1, 1966, Louis Flarsheim informed the employees, including the plaintiff, of the sale by letter, stating:

"To All Seavey & Flarsheim Employees

No doubt you have informally heard that we have been negotiating a sale of our business and assets. This letter is official notice to you that effective as of midnight, February 28, 1966, that sale was consummated. *The sale, of course, effects an immediate termination of our payroll and your employment by our company.*

On behalf of all our management I want to express our great appreciation for your loyalty and cooperation to the company over the past years, and I want to add my own personal thanks.

We are pleased to be able to tell you the business of Seavey & Flarsheim will be continued under the name Seavey & Flarsheim Brokerage Company, Inc., and Marsh E. Blackburn, as President, will be writing you within the next few days. *In the interim, he has asked me to advise you that he desires you to continue your employment with that company.*

We are confident you will have a successful and happy relationship under the new management.

Sincerely,
/s/ Louis Flarsheim
Louis Flarsheim, President

LF/bm" (Emphasis supplied)

Plaintiff testified that in February, 1966, Mr. Blackburn and one Stan Merchant, visited him in St. Louis and attempted to get him to stay with the new .company. He declined and told Blackburn he would not stay. There were problems in the St. Louis office and the second in command there had recently resigned. Blackburn asked him to stay on in St. Louis until a replacement for him, Alldredge, could be found. Blackburn again visited plaintiff in St. Louis in March, 1966, right after the sale and again asked him to stay with the new organization. Again plaintiff declined, but did agree verbally with Blackburn to remain in St. Louis in a strictly administrative capacity to oversee that office operation "on a temporary basis * * * not to exceed a one month period of time." The plaintiff stayed with the new company in that capacity for 25 days and was paid for these services. On March 25, 1966, he permanently severed all connections with the new company. It should be further noted that Blackburn at this time did not claim, for the new company, any rights as assignee of the plaintiff's employment contract.

After Alldredge left the employ of Seavey and Flarsheim Brokerage Company, Inc., he immediately began his own grocery brokerage business. On September 7, 1966, Alldredge filed a petition seeking the additional termination compensation under the employment contract of November 26, 1951.

On August 29, 1972, judgment was rendered for plaintiff in the amount of $6,974.48 (10% of plaintiff's annual salary and 1% of the compensation earned by plaintiff while employed by defendant), plus interest at 6% from March, 1966. The accuracy of this computation is not disputed.

Likewise, there is no dispute that the defendant did in fact terminate Alldredge's employment. The letter of March 1, 1966, addressed to all employees, announced the "*immediate termination of* our

payroll and *your employment by our company*". (Emphasis added). Indeed, the brief of the defendant filed in this court argues, in part, that plaintiff "did not comply with the restrictive provision; he engaged in the grocery brokerage business in Missouri immediately after his employment was *terminated by appellant.*" (Emphasis supplied). It should be further noted that this letter contains no statement of any purported assignment of the plaintiff's employment contract nor request that he agree to any such assignment.

The issue here is:

Was the plaintiff entitled to the "additional pay" under the employment contract even though he immediately engaged in the grocery brokerage business after being terminated, where the defendant sold the assets of the corporation, terminated all of its activities in the grocery brokerage business, and purportedly assigned the contract to the buyer as part of the "good will" assets?

█ The defendant argues, first, that the contract "should be construed as binding him not to compete with the business in which he was employed, whether that business was conducted by his then employer or by its successor." This argument lacks merit.

The contract here involved clearly was drafted to protect the defendant's predecessor from competition by the plaintiff in the food brokerage business in the event the employer-employee relationship ceased. The food brokerage business is highly competitive and its success depends, in great part, upon the personal relationships and business acquaintances developed over a period of time. Renwood Food Products, Inc. v. Schaefer, 240 Mo.App. 939, 223 S.W.2d 144, 152 (1949). Thus, the purpose of such contracts is to prevent the employee from taking unfair advantage by use of "an influence acquired by said employee over the customers of his employer." Renwood Food Products, Inc. v. Schaefer,

supra, l.c. 151. The plain language and meaning of the contract is that the restrictive provisions of the agreement were to prevent the plaintiff from competing with *defendant* (not its successors or assigns) in the grocery brokerage business. There is no language in the contract to indicate that the parties intended otherwise.

Plaintiff is not in competition with *defendant* because the defendant no longer is engaged in the grocery brokerage business. Thus, plaintiff has not violated the restrictive provisions of the employment agreement.

■ In the alternative, the defendant argues that it assigned this contract to Hoosier when it sold the assets (including good will) to Hoosier. Defendant cites cases from other jurisdictions to support this proposition. However, it overlooks the controlling decision here of Allied Pipeline Corp. v. Studley, 191 S.W.2d 317 (Mo.App.1946), wherein the court held: "The law is well settled that a contract is not assignable without the consent of both parties where the personal acts and qualities of one of the parties form a material and ingredient part of the contract." loc. cit. page 320. See also: Sympson v. Rogers, 406 S.W.2d 26, 30 (Mo.1966) and 6 Am.Jur.2d Assignments, § 11.

Here, the evidence from the trial below clearly shows that the plaintiff did not give his consent to, nor have any knowledge of, any such purported assignment. Indeed, the record is silent as to any attempted assignment, except as such might be improperly and illegally deemed to have resulted *ipso facto* and without the employee's consent by reason of the sale of the "good will". Further, there is no language in the 1951 employment contract to indicate that the parties ever intended that such contract could be assigned. That being so, the contract was not assigned, so far as plaintiff is concerned, to the buyer of the business. If differences exist as to these restrictive provisions, such confront plaintiff's original employer and Hoosier the purchaser of the business, and cannot be adjudicated here.

■ Lastly, the defendant argues that the contract provided that in the event a court determined the restrictive provisions to be unenforceable, there would be no "termination payment", and since the trial court found for plaintiff, the trial court must have determined the restrictive provisions to be unenforceable. This argument must fail.

It does not follow that a judgment for plaintiff necessitates a determination that the restrictive provisions are unenforceable. From the face of the contract, the provisions would be enforceable had the defendant continued in business, since the covenant not to compete is reasonable as to time and space. Mills v. Murray, 472 S.W.2d 6, 11–12 (Mo.App.1971); R. E. Harrington v. Frick, 428 S.W.2d 945 (Mo.App.1968) and Willman v. Beheler, 499 S.W.2d 770 (Mo.1973). Rather, it appears that the plaintiff has not violated the restrictive provisions of the contract for the simple reason that he is not in competition with the *defendant*.

The judgment of the trial court is clearly proper under the law and the evidence, and is accordingly affirmed.

All concur.