936 F.2d 1496
 60 USLW 2061, Bankr. L. Rep. P 74,066
 In the Matter of Nelson Grant HALLAHAN, doing business as
Nelson Hallahan and Associates, Debtor.
N.I.S. CORPORATION and Ozark Life Insurance Company,
Plaintiffs-Appellees,
v.
Nelson Grant HALLAHAN, Defendant-Appellant.
 No. 90-2054.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 22, 1991.
Decided July 10, 1991.
 
 Mark G. Zellmer, Husch, Eppenberger, Donohue, Cornfeld & Jenkins, St. Louis, Mo. and Bret S. Babcock, Peoria, Ill., for appellees.
 Nile J. Williamson, Peoria, Ill., for debtor-appellant.
 Before CUMMINGS, RIPPLE and KANNE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 The bankruptcy court found Nelson Hallahan's debt to N.I.S. Corporation ("N.I.S.") and its parent, Ozark Life Insurance Company ("Ozark"), to be non-dischargeable and in addition refused to honor Hallahan's demand for a jury trial to determine the dischargeability of the debt and the amount owed. We review the district court's affirmance of the bankruptcy court's ruling.
 
 FACTS
 
 2
 Nelson Hallahan began selling insurance policies for Ozark in 1977. In 1981 he was promoted to manager, and at that time he signed a contract with N.I.S., the subsidiary of Ozark responsible for selling policies. The contract contained a covenant not to compete which stated:
 
 
 3
 If this Contract is terminated by either party for any reason, Agent agrees that he will not, for a period of four (4) years from the date of termination, within the county or counties in which Company is located or doing business at the time of termination or within the immediate adjoining counties: * * * (iii) Directly or indirectly, for himself or on behalf of any other person or firm, induce or attempt to induce any policyholder of any Insurance Company to cancel, surrender, apply for a policy loan under or to discontinue the payments or premiums on any policy issued by such Insurance Company.
 
 
 4
 N.I.S. terminated Hallahan in December 1983, and Hallahan went to work for a competing insurance company, Connecticut Mutual. Hallahan immediately began soliciting business from Ozark policyholders he had served while at Ozark.
 
 
 5
 Ozark brought suit in federal court in the Western District of Missouri in August 1984 seeking a permanent injunction that would prevent Hallahan from violating the terms of his contract. Hallahan agreed to the issuance of a preliminary injunction during discovery, and on September 21, 1984, the court entered an order enjoining Hallahan from selling Connecticut Mutual policies to Ozark policyholders.
 
 
 6
 In June 1985, Hallahan filed a voluntary petition for bankruptcy in the Central District of Illinois under Chapter 7 of the Bankruptcy Code. N.I.S. filed a proof of claim in the bankruptcy court and a complaint for nondischargeability pursuant to 11 U.S.C. Sec. 523(a)(6) (1988). Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" cannot be discharged. Seeking injunctive relief as well as recovery of money damages, N.I.S. claimed that Hallahan had inflicted malicious and willful injury upon it by willfully violating the terms of his contract and by tortiously interfering with the business expectations of N.I.S. N.I.S. then filed in the district court below a motion to withdraw the matter from the bankruptcy court[1] and transfer the adversary proceeding to the Western District of Missouri. Hallahan opposed the motion to transfer and the district court denied N.I.S.'s motion. Subsequently Ozark was added as a party plaintiff to the complaint filed in bankruptcy court, and the case proceeded in Illinois. The case in Missouri was eventually dismissed without prejudice in 1988.
 
 
 7
 All parties moved for summary judgment in the adversary proceeding in the bankruptcy court. Hallahan also requested a jury trial, arguing that because the underlying breach of contract action was a "suit at common law," the Seventh Amendment preserved his right to a jury trial, regardless of the fact that the suit was being tried as part of an equitable bankruptcy proceeding. The bankruptcy judge partially granted plaintiffs' motion for summary judgment, ruling that any debt due to Ozark and N.I.S. was non-dischargeable, because Hallahan had willfully breached his contract. Hallahan did not deny soliciting Ozark's customers. The court declined to discuss plaintiffs' claim of tortious interference, and it denied Hallahan's request for a jury trial, holding that "there is no right to a jury trial in the bankruptcy court in a dischargeability action."
 
 
 8
 After a trial addressing the amount of liability, the bankruptcy court found that plaintiffs were entitled to $208,111.28 in money damages for lost profits. The court also awarded attorney's fees of $43,723.24, making the total non-dischargeable debt $251,834.52.
 
 
 9
 Hallahan appealed to this Court after the district court affirmed the bankruptcy court's findings. 113 B.R. 975. Three issues are presented: 1) whether the restrictive covenant in Hallahan's contract is unenforceable under Missouri law; 2) whether damages were sufficiently proven; and 3) whether the bankruptcy court erred in denying Hallahan's request for a jury trial. We take these questions in turn.[2]The Enforceability of the Restrictive Covenant
 
 
 10
 Hallahan urges this Court to find that the covenant not to solicit contained in his employment contract was unenforceable. The bankruptcy court noted that if the covenant was valid, Hallahan breached it with sufficient willfulness to support the finding of non-dischargeability under Section 523(a)(6) of the Bankruptcy Code, 11 U.S.C. Sec. 523(a)(6) (1988). Hallahan apparently concurs in this view, for he does not contend that his actions were not willful.[3]
 
 
 11
 In their contract, the parties agreed that Missouri law would govern questions regarding contract interpretation. Hallahan advances four reasons that the restrictive covenant is unenforceable under Missouri law. First, he believes that Ozark did not have a protectable interest in its customer lists and thus that he was free to use them to solicit Ozark policyholders after he began working for Connecticut Mutual. Second, Hallahan argues that the scope of the covenant not to solicit was too broad geographically and in duration to be enforceable. Third, Hallahan interprets Missouri case law to hold that restrictive covenants cannot bind agents like him though they can be enforced against employees. Finally, he contends that the contract was one of adhesion.
 
 
 12
 None of these contentions has enough merit to warrant extended discussion. Hallahan's first argument about the propriety of his use of Ozark's customer lists is simply beside the point. Hallahan cites cases involving a former employee's common law duties not to reveal trade secrets. See, e.g., American Wheel & Engineering Co. v. Dana Molded Products, Inc., 132 Ill.App.3d 205, 87 Ill.Dec. 299, 476 N.E.2d 1291 (1st Dist.1985). Ozark and N.I.S. do not seek to recover damages for Hallahan's breach of a common law duty to protect customer lists. Instead they allege breach of a contract provision designed to protect their interests in the customers themselves. Such covenants have been enforced in Missouri courts even in the absence of any improper use of customer lists. See Prentice v. Rowe, 324 S.W.2d 457, 462 (Mo.Ct.App.1959) (employee can be held liable for violation of reasonable restrictive covenant aimed at discouraging attempts by former employee to entice away customers even if employee did not use trade secrets or customer lists).
 
 
 13
 Hallahan likewise cannot prevail in his arguments relating to the reasonability of the covenant. In Missouri, a covenant not to solicit is valid so long as plaintiff demonstrates its reasonableness. Mills v. Murray, 472 S.W.2d 6, 11 (Mo.Ct.App.1971). Post-employment restrictions generally must be qualified as to time and area and be no greater than fairly required to protect the employer. Id. Hallahan's contract specified that his solicitations would be restricted for four years after termination within any counties in the United States where Ozark did business. Missouri appellate courts have enforced covenants not to solicit extending to a five-year duration. See Garlichs Agency Co. v. Anderson, 226 S.W. 978 (Mo.Ct.App.1920) (defendant enjoined from engaging in insurance business for five years); see also Mills, 472 S.W.2d at 12 (collecting cases). A geographic limitation of the type contained in Hallahan's contract similarly is not unreasonable under Missouri law. See Alldredge v. Twenty-Five Thirty-Two Broadway Corp., 509 S.W.2d 744 (Mo.Ct.App.1974) (enforcing covenant restricting competition in any state in U.S. in which plaintiff does business). The contours of the covenant were drawn fairly to protect Ozark and N.I.S. and Hallahan's challenges are not aided by a consideration of the applicable law.
 
 
 14
 Hallahan tries to escape the obligation imposed by the covenant not to solicit by formalistically separating agents from employees. He notes that Missouri law defines the purpose of the restrictive covenant as the protection of "an employer from unfair competition by a former employee." Continental Research Corp. v. Scholz, 595 S.W.2d 396, 399 (Mo.Ct.App.1980). Hallahan takes these and other similar statements in the relevant case law to mean that restrictive covenants cannot be enforced unless made in the context of an employer-employee relationship. Hallahan's own agency contract with the plaintiffs stated emphatically that the terms of his contract would not "be construed to create a relationship of an employer and employee."
 
 
 15
 A fair reading of Missouri common law supports the enforcement of reasonable restrictive covenants imposed upon agents. The cases naturally most often discuss covenants binding employees. However, the general notion favoring the enforcement of covenants not to solicit applies equally to agents and employees. The aim is to protect a customer base which is properly characterized as the interest of the principal or the employer by restricting the post-employment activities of the subsidiary agents or employees. The idea was stated with slight variation in Renwood Food Products, Inc. v. Schaefer, 240 Mo.App. 939, 223 S.W.2d 144, 150-151 (1949): "[to] requir[e] persons who, by the solemnity of contract, had assumed certain engagements, to observe them." Missouri courts have applied the same "reasonableness" standard to restrictive covenants assumed either by employees or agents. See Prentice, 324 S.W.2d at 461 (covenant binding independent contractor and covenant binding employee analyzed by same reasonableness test, though former covenant ultimately held non-enforceable).
 
 
 16
 Finally, Hallahan's contention that he was forced to sign a contract of adhesion is utterly without merit. Deposition testimony established that the N.I.S. attorney reviewed the contracts with prospective managers for two hours before signing. In particular he explained to Hallahan and to other prospective managers the provisions of the covenant not to solicit. Hallahan cannot credibly maintain that he had no understanding of the terms of the contract or that he had no opportunity to bargain with Ozark. Furthermore, the contract is not so burdensome to Hallahan that it can be deemed unconscionable. As in USA Chem, Inc. v. Lewis, 557 S.W.2d 15 (Mo.Ct.App.1977), defendant was not coerced into signing, but "chose to accept employment in the justified belief it would be mutually gainful." Id. at 24. The terms of the contract are unexceptional and the contract is valid.
 
 
 17
 To summarize, the covenant not to solicit contained in Hallahan's contract is enforceable under Missouri law. Because Hallahan concedes that he breached the contract willfully, the bankruptcy court's finding that Hallahan's debt to the plaintiffs is non-dischargeable under Section 523(a)(6) will not be disturbed.[4]Damages
 
 
 18
 Hallahan maintains that the bankruptcy court's assessment of Ozark's lost profits was "wholly speculative" (Def. Br. 17). The court had calculated Hallahan's liability to be $208,111.28.
 
 
 19
 The plaintiffs' experts calculated damages by estimating the value of the loss of 246 insurance policies to Ozark. Two hundred forty-six policyholders who had Hallahan as their agent had cancelled their policies within a short time after Hallahan's departure from Ozark.[5] The bankruptcy court accepted plaintiffs' methodology of valuing these lost policies and then discounting the total by a certain percentage representing the policies that the company would have expected to lapse as a matter of historical experience even in the absence of Hallahan's conduct.
 
 
 20
 This method was sound. Hallahan attacks the methodology by arguing, for example, that his own personal lapse rate of over 50% should have been used to discount the loss to Ozark rather than the company-wide ratio which was considerably lower. This argument is ludicrous, for discounting the damages by Hallahan's lapse ratio would reward him for breaching the terms of his contract and enticing Ozark policyholders to Connecticut Mutual.
 
 
 21
 Hallahan likewise argues about the interest rate used by plaintiffs' experts and various other statistics accepted by the bankruptcy court. These arguments, however, amount to attacks on the credibility of plaintiffs' witnesses and quibbles about the details of their testimony. Credibility determinations are for the finder of fact. Also, under Illinois law,[6] lost future profits need not be established by detailed or direct proof, Vendo Co. v. Stoner, 58 Ill.2d 289, 310, 321 N.E.2d 1, 13 (1974), certiorari denied, 420 U.S. 975, 95 S.Ct. 1398, 43 L.Ed.2d 655. The plaintiff is only required to present evidence which will establish, with a fair degree of probability, a basis for the assessment of damages. Schatz v. Abbott Laboratories, Inc., 51 Ill.2d 143, 281 N.E.2d 323 (1972).
 
 
 22
 The bankruptcy court carefully weighed the witnesses' testimony and made extensive findings regarding the damage calculation. We agree with the district court's assessment of Hallahan's arguments regarding damages and find them to be "specious." In re Hallahan, 113 B.R. 975 (C.D.Ill.1990) (order).[7]
 
 Right to Jury Trial in Bankruptcy Court
 
 23
 Hallahan argues that because the suit between himself and Ozark is legal in nature, he had a right to a jury trial. Had the complaint alleging breach of contract been filed in district court rather than in a bankruptcy proceeding, Hallahan would clearly have had the right to demand a jury under the Seventh Amendment, which preserves a litigant's right to a jury in "suits at common law." The question is whether the suit, which is legal in nature when brought outside of bankruptcy court, sheds its legal character when heard as part of a dischargeability proceeding conducted by a bankruptcy court in the exercise of its traditional equitable jurisdiction.
 
 
 24
 We review de novo the legal question of whether Hallahan was entitled to a jury trial. Standard Oil Co. v. Arizona, 738 F.2d 1021, 1022-1023 (9th Cir.1984), certiorari denied sub nom. Chevron Corp. v. Arizona, 469 U.S. 1132, 105 S.Ct. 815, 83 L.Ed.2d 807. Our analysis begins with an examination of Hallahan's Seventh Amendment rights. Because Congress may confer jury trial rights beyond those granted by the Constitution, however, we also consider whether Hallahan has any statutory right to a jury trial. See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 40 n. 3, 109 S.Ct. 2782, 2789 n. 3, 106 L.Ed.2d 26.
 
 A. Seventh Amendment
 
 25
 In Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391, decided in 1966, the Supreme Court suggested that the bankruptcy court, as a part of its equitable power to divide and distribute the estate, could decide without juries an issue necessary to carry out the division, even if the issue would merit jury consideration outside the bankruptcy forum. The main holding in Katchen involved the bankruptcy court's subject matter jurisdiction. The Court held that under the 1898 Bankruptcy Act it was within a bankruptcy court's summary jurisdiction to order a creditor who had submitted claims against the bankrupt estate to surrender voidable preferences. 382 U.S. at 334-335, 86 S.Ct. at 475. The 1898 Act vested in bankruptcy courts "summary jurisdiction" over disputes about property in the actual or constructive possession of the bankruptcy court. Matters falling within a bankruptcy court's summary jurisdiction were understood to be equitable matters to which no jury trial right attached. Plenary matters, by contrast, typically involved disputes over property in the possession of a third person and were heard in district court. See generally Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 53, 102 S.Ct. 2858, 2862, 73 L.Ed.2d 598.
 
 
 26
 In reaching its holding, the Court rebuffed the creditor's argument that granting summary jurisdiction over the preference issue deprived him of his Seventh Amendment right to a jury trial. The Court acknowledged that the creditor could have demanded a jury trial on his essentially legal claim under the Seventh Amendment if the trustee had pursued his action for return of the preference outside of bankruptcy court. Id. 382 U.S. at 336, 86 S.Ct. at 476. It stated, however, that "when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity." Id. The Court wrote:
 
 
 27
 [I]n cases of bankruptcy, many incidental questions arise in the course of administering the bankrupt estate, which would ordinarily be pure cases at law, and in respect of their facts triable by jury, but, as belonging to the bankruptcy proceedings, they become cases over which the bankruptcy court, which acts as a court of equity, exercises exclusive control. Thus a claim of debt or damages against the bankrupt is investigated by chancery methods.
 
 
 28
 382 U.S. at 337, 86 S.Ct. at 477, quoting Barton v. Barbour, 104 U.S. 126, 133-134, 26 L.Ed. 672 (1881). The bankruptcy proceeding thus converted the creditor's legal claim into an equitable claim to a pro rata share of the res, or estate. 382 U.S. at 336, 86 S.Ct. at 476.
 
 
 29
 By placing emphasis on the forum in which the claim arose, Katchen seemed to give bankruptcy courts broad discretion to deny jury trials for claims related to the administration or division of the estate. In 1978 the Bankruptcy Reform Act was enacted, eliminating the old summary/plenary distinction and creating "core" and "non-core" matters.[8] Though "core proceedings" were defined significantly more broadly than summary jurisdiction, some courts read the 1978 Bankruptcy Reform Act and Katchen together to conclude that there was no right to a jury trial in all "core" proceedings. See, e.g., In re Chase & Sanborn Corp., 835 F.2d 1341, 1349 (11th Cir.1988), certiorari granted sub nom. Granfinanciera, S.A. v. Nordberg, 486 U.S. 1054, 108 S.Ct. 2818, 100 L.Ed.2d 920, reversed, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26; In re Merrill, 594 F.2d 1064, 1065 (5th Cir.1979).
 
 
 30
 Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, dramatically revived the rights of some creditors in bankruptcy court to demand a jury trial. Granfinanciera involved a trustee's attempt to recover an allegedly fraudulent conveyance from the bank Granfinanciera. The bank, for its part, denied receiving any funds before bankruptcy. As an initial matter, the Court criticized the notion that the core/non-core distinction created by Congress was determinative of a party's jury trial rights.
 
 
 31
 Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity.
 
 
 32
 492 U.S. at 61, 109 S.Ct. at 2800. The inquiry must focus on the legal or equitable nature of the cause of action, and not Congress' "taxonomic change[s]." Id. A proper determination of whether the Seventh Amendment confers a right to jury trial for a claim heard in bankruptcy court entails a two-part inquiry:
 
 
 33
 First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.
 
 
 34
 492 U.S. at 42, 109 S.Ct. at 2790, citing Tull v. United States, 481 U.S. 412, 417-418, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365. Applying the test, the Court held that Granfinanciera could obtain a jury trial in spite of the fact that fraudulent conveyance actions are "core" proceedings under the Act. The Court discussed at some length the fact that actions to recover preferential or fraudulent transfers were brought at law in 18th-century England. It also held that the nature of the relief sought in a fraudulent conveyance action is legal rather than equitable. Because the claim was legal in nature and Congress was without power to change that characterization,[9] Granfinanciera was entitled to a jury under the Seventh Amendment.
 
 
 35
 Granfinanciera did not overrule Katchen. Instead the Court distinguished Katchen in a manner relevant to this case. Granfinanciera restated the notion set forth in Katchen that a bankruptcy court having actual or constructive possession of the bankruptcy estate could adjudicate objections by the trustee and claims against the estate. However, the Court held that in Katchen it was the creditor's submission of a claim to the bankruptcy court which triggered the process of "the allowance and disallowance of claims" and subjected the creditor's otherwise legal claim to the bankruptcy court's equitable power. In Granfinanciera, the party seeking the jury trial (Granfinanciera) had never filed a claim against the estate, and thus the trustee had been forced to initiate what amounted to a legal action against the bank to recover a monetary transfer. In these circumstances, the Court held, defendant is entitled to a jury trial. Granfinanciera, 492 U.S. at 57-58, 109 S.Ct. at 2798. The proposition which emerges from a reading of Katchen and Granfinanciera together, that a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate, was reaffirmed by the Court last Term in Langenkamp v. Culp, --- U.S. ----, 111 S.Ct. 330, 112 L.Ed.2d 343.
 
 
 36
 Applying the Supreme Court's teachings to this case, we conclude that Hallahan had no Seventh Amendment right to a jury trial on his dischargeability claim. Two independent lines of reasoning support this conclusion. First, application of the two-part test set forth in Granfinanciera reveals that a dischargeability proceeding is a type of equitable claim for which a party cannot obtain a jury trial. Dischargeability proceedings, like actions to recover preferential or fraudulent transfers, are core proceedings. See 28 U.S.C. Sec. 157(b)(2)(I) and (J) (1988). However, dischargeability proceedings are unlike actions to recover preferential transfers in that historically they have been equitable actions tried without juries:
 
 
 37
 [A] bankruptcy discharge and questions concerning the dischargeability of certain debts, involve issues with an equitable history and for which there was no entitlement to a jury trial in the courts of England prior to the merger of law and equity.
 
 
 38
 In re Hooper, 112 B.R. 1009, 1012 (Bankr. 9th Cir.1990); In re Johnson, 110 B.R. 433, 434 (Bankr.W.D.Mo.1990); In re Brown, 103 B.R. 734 (Bankr.W.D.Md.1989), see also Countryman, The New Dischargeability Law, 45 Am.Bankr.L.J. 1, 36-39 (1971). The relief sought is also equitable since the essence of a dischargeability claim is a declaration that the debt is indeed dischargeable or non-dischargeable. Hooper, 112 B.R. at 1012.
 
 
 39
 Even if we were to assume that the dischargeability action was legal in nature, however, Hallahan cannot claim a right to jury trial because, as a Chapter 7 debtor, he voluntarily submitted his case to bankruptcy court. The Supreme Court did not address the extent of the debtor's Seventh Amendment right to jury trial in bankruptcy court in Granfinanciera. However, if creditors "by presenting their claims * * * subject[ ] themselves to all the consequences that attach to an appearance," Granfinanciera, 492 U.S. at 59 n. 14, 109 S.Ct. at 2799 n. 14, quoting Alexander v. Hillman, 296 U.S. 222, 241, 56 S.Ct. 204, 210, 80 L.Ed. 192, thereby losing any jury trial right otherwise guaranteed by the Seventh Amendment, debtors who initially choose to invoke the bankruptcy court's jurisdiction to seek protection from their creditors cannot be endowed with any stronger right.[10] A defendant or potential defendant to an action at law cannot initiate bankruptcy proceedings, thus forcing creditors to come to bankruptcy court to collect their claims, and simultaneously complain that the bankruptcy forum denies him or her a jury trial. See, e.g., In re Johnson, 110 B.R. 433 (Bankr.W.D.Mo.1990) (debtor has no right to jury trial in adversary proceeding brought by bank to except debt from discharge as having been incurred by fraud); In re Edwards, 104 B.R. 890 (Bankr.E.D.Tenn.1989) (same).
 
 
 40
 This case presents a perfect example of the injustice that would result from granting a voluntary debtor[11] who is a defendant in an adversary proceeding a right to jury trial on demand. After Hallahan filed for bankruptcy, Ozark was prevented by the automatic stay provisions of the Code, 11 U.S.C. Sec. 362, from commencing or continuing any litigation outside of the bankruptcy case to recover its claim. Ozark thus was forced to file a proof of claim and initiate a dischargeability proceeding in bankruptcy court. Under Granfinanciera, Ozark's filing stripped it of any right to jury trial it might otherwise have claimed. It would be anomalous to hold that Hallahan could yet obtain a jury trial in bankruptcy court in these circumstances. Debtors then would be able to block their creditors' access to a jury trial without compromising their own ability to demand a jury in their preferred forum.
 
 
 41
 A careful consideration of the Granfinanciera opinion and its possible effects on the relative rights of debtors and creditors in bankruptcy court leads us to concur in the conclusion reached by the Johnson and Edwards courts. The Seventh Amendment confers no right to a jury trial on a debtor like Hallahan, who files voluntarily for bankruptcy and is a defendant in an adversary proceeding. Even if Hallahan was pursuing a "legal" claim, by submitting it to the bankruptcy forum he lost any Seventh Amendment jury trial right he might have asserted.
 
 B. Statutory Provisions
 
 42
 Hallahan argues that even if the Constitution does not guarantee him a right to a jury trial in his dischargeability proceeding, the Bankruptcy Rules and statutes do. He relies specifically on Rule 9015(a) of the Rules of Bankruptcy Procedure and 28 U.S.C. Sec. 1411 (1988).
 
 
 43
 Rule 9015 cannot aid Hallahan. The rule was abrogated effective August 1, 1987. Even when it was in effect, the rule did not affirmatively confer a right to jury trial but was instead a procedural rule providing for a trial by jury if the right existed and a proper demand was made. Rule 9015(a) stated:
 
 
 44
 (a) Trial by jury. Issues triable of right by jury shall, if timely demanded, be tried by jury, unless the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury.
 
 
 45
 The rule by its own terms applied only when issues were otherwise "triable of right by jury." It did nothing to supply that right. In fact, it was because courts were mistakenly interpreting the rule to supply a substantive right that the rule was abrogated. See Bankr.R. 9015 (abrogated Aug. 1, 1987) Advisory Committee Note.
 
 
 46
 Whether 28 U.S.C. Sec. 1411 confers a right to jury trial in bankruptcy court for Hallahan's dischargeability proceeding is a closer question. 28 U.S.C. Sec. 1411 is the latest Congressional enactment on the subject of jury trials in bankruptcy, having been promulgated as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA). Subsection (a) states:
 
 
 47
 (a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable non-bankruptcy law with regard to a personal injury or wrongful death tort claim.
 
 
 48
 28 U.S.C. Sec. 1411(a). If Section 1411 ended at subsection (a), Hallahan clearly would not be entitled to a jury trial, for the claim at issue is not a personal injury or wrongful death tort claim.
 
 
 49
 Subsection (b), however, muddies the question. It provides:
 
 
 50
 (b) The district court may order the issues arising under section 303 of title 11 [dealing with involuntary bankruptcy petitions] to be tried without a jury.
 
 
 51
 28 U.S.C. Sec. 1411(b). Subsection (b), by stating that district courts "may" order issues arising in connection with involuntary petitions to be tried without a jury, carries the implication that district courts may not deny jury trials on some issues presented in connection with voluntary petitions.[12]
 
 
 52
 The ambiguity on the face of Section 1411 by itself is not enough to support a claim that Hallahan is entitled to a jury trial on the breach of contract issue arising in his dischargeability proceeding. There is an absence of any helpful legislative history supporting either the view that the statute intends to grant jury trials in bankruptcy court only in personal injury and wrongful death actions or that some broader jury trial right is implied. See Granfinanciera, 492 U.S. at 40 n. 3, 109 S.Ct. at 2789 n. 3 (legislative history is "confused"); see also Gibson, Jury Trials in Bankruptcy: Obeying the Commands of Article III and the Seventh Amendment, 72 Minn.L.R. 967, 989-996 (1988) (compiling legislative history of Section 1411). Were we reading Section 1411 in isolation, we would prefer the former interpretation giving effect to the clear language of Subsection (a) rather than the interpretation that would enforce the negative implication arising out of Subsection (b).
 
 
 53
 There is some question, however, about whether Section 1411 can properly be read in isolation. The predecessor statute to Section 1411, 28 U.S.C. Sec. 1480(a) (1982 ed., Supp. V), conferred broader jury trial rights than Section 1411 and was arguably never repealed or abrogated. 28 U.S.C. Sec. 1480(a) provided:
 
 
 54
 [T]his chapter and title 11 do not affect any right to trial by jury, in a case under title 11 or in a proceeding arising under title 11 or arising in or related to a case under title 11, that is provided by any statute in effect on September 30, 1979.
 
 
 55
 No legislative history exists on the intended interplay of Section 1411 and Section 1480. In the absence of guidance from Congress, courts predictably have split on the question of whether Section 1411 supplants Section 1480. Some courts have held that Section 1480 was repealed by the 1984 enactment of BAFJA and that a statutory right to jury trials in bankruptcy court exists only for personal injury and wrongful death actions. See, e.g., In re Smith, 84 B.R. 175, 177-178 (D.Ariz.1988); In re O'Bannon, 49 B.R. 763, 769 (M.D.La.1985). Others have concluded that Section 1480 has not been repealed and thus that Section 1411 is not the sole source of a jury trial right in bankruptcy court. See, e.g., In re Wolfe, 68 B.R. 80, 87 (N.D.Tex.1986); In re Rodgers & Sons, Inc., 48 B.R. 683, 687 (E.D.Okla.1985).
 
 
 56
 We need not resolve the question of the continued viability of Section 1480 here. If Section 1480 has been repealed, Hallahan has no jury trial right, for the underlying claim is breach of contract, not tort. If Section 1480 remains in force, the result is the same. By directing that reference be made to "any statute in effect on September 30, 1979," Section 1480 intends to preserve the right to jury trial that existed under the 1898 Bankruptcy Act. See, e.g., In re McLouth Steel Corp., 55 B.R. 357, 361 (E.D.Mich.1985) (collecting authority). This Court has previously held that the old Bankruptcy Act granted no statutory right to jury trial in a dischargeability proceeding. See In re Swope, 466 F.2d 936 (7th Cir.1972) (Section 17(a)(2) of the Bankruptcy Act (11 U.S.C. Sec. 35(c)(5) (1976) (repealed)) does not confer right to jury trial for determination of dischargeability), certiorari denied, 409 U.S. 1114. Even if we were to hold that Section 1480 survived the enactment of Section 1411, Hallahan would not prevail, because Section 1480 simply does not extend the right of a jury trial to a debtor in a dischargeability proceeding.
 
 
 57
 The bankruptcy court properly struck Hallahan's jury demand. The relevant statutory provisions do not guarantee Hallahan a right to a jury trial for the determination of dischargeability. The Seventh Amendment likewise does not confer any right to a jury trial in a dischargeability proceeding, for such an action has always been deemed equitable rather than legal in nature. Moreover, Hallahan as a voluntary debtor and defendant in an adversary proceeding has no Seventh Amendment right to a jury trial.
 
 
 58
 Hallahan at oral argument contended that even if this Court found he had no right to a jury trial for the declaration of dischargeability, the Court should order a jury trial for the related questions of liability and damages. There is authority for the type of bifurcated dischargeability proceeding Hallahan espouses. See, e.g., In re Merrill, 594 F.2d 1064, 1068 (5th Cir.1979) (once bankruptcy court determined that debt was not dischargeable, appellant entitled to jury trial on the issues of liability and amount); Swope, 466 F.2d at 938 (suggesting in dicta that jury trial right may exist for factual issues subsidiary to question of dischargeability); Hooper, 112 B.R. at 1012 (same); Countryman, The New Dischargeability Law, 45 Am.Bankr.L.J. 1, 36-39. However, as discussed supra, Hallahan by choosing to file for bankruptcy, waived any complaints he may have had about the jury trial rights that he might have asserted outside the bankruptcy forum. Moreover, we think it preferable to allow bankruptcy courts ruling on the dischargeability of a debt to adjudicate the issues of liability and damages also. See In re Schmid, 54 B.R. 520, 522-523 (E.D.Pa.1985); In re Devitt, 126 B.R. 212 (D.Md.1991). Requiring the empaneling of a jury in bankruptcy court in the midst of the dischargeability proceedings, or perhaps referring the matter back to district court for a jury trial there, creates a cumbersome process. More importantly, however, allowing the bankruptcy judge to settle both the dischargeability of the debt and the amount of the money judgment accords with the
 
 
 59
 rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief.
 
 
 60
 Alexander v. Hillman, 296 U.S. at 242, 56 S.Ct. at 2802. Once properly before a court of equity, a party subjects himself or herself "to all the consequences that attach to an appearance," id. at 241, 56 S.Ct. at 210, meaning here that the amount of Hallahan's liability was properly determined without a jury.[13]
 
 CONCLUSION
 
 61
 For the foregoing reasons, we find that the bankruptcy court properly granted summary judgment to the plaintiffs on the issue of whether Hallahan willfully breached his contract with Ozark and N.I.S. Furthermore, there were no reversible errors in the bankruptcy court's calculation of damages, and Hallahan's jury trial demand was properly stricken. The judgment is therefore affirmed.
 
 
 
 [1]
 28 U.S.C. Sec. 157 (1988) provides in part, "The district court may withdraw [from bankruptcy court], in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."
 
 
 [2]
 As a preliminary matter, we dispose of Hallahan's argument that plaintiffs cannot pursue this suit for money damages after having obtained injunctive relief from the federal district court in the Western District of Missouri
 First, res judicata does not bar this suit in bankruptcy court because the earlier suit in Missouri never culminated in a final judgment. The case was dismissed without prejudice, and such a dismissal has no res judicata effect. Sypert v. Miner, 266 F.2d 196, 198 (7th Cir.1959), certiorari denied, 361 U.S. 832, 80 S.Ct. 82, 4 L.Ed.2d 74.
 Second, this suit does not threaten to compensate plaintiffs twice for the same wrong, in violation of the doctrine of the election of remedies. See Roberts v. Sears, Roebuck & Co., 573 F.2d 976 (7th Cir.1978), certiorari denied, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168, later proceeding, 617 F.2d 460 (7th Cir.1980). In Missouri, plaintiffs obtained an injunction preventing Hallahan from future breaches of the covenant not to solicit. In bankruptcy court, they sought monetary damages for breaches which had occurred prior to issuance of the preliminary injunction. The election of remedies doctrine does not prevent a party who has obtained an injunction covering one period of time to seek damages for injuries inflicted before the injunction took effect. Roberts, 573 F.2d at 985 (plaintiff can seek return of fraudulently obtained patent and profits lost in past from defendant's wrongful use of patent).
 
 
 [3]
 Hallahan does not contest the standard of willfulness used by the bankruptcy court. The court held that to qualify for Section 523(a)(6), plaintiffs had to prove by clear and convincing evidence that Hallahan's conduct was deliberate and intentional and resulted in harm or injury. See In re Cerar, 97 B.R. 447, 451-452 (C.D.Ill.1989). The Supreme Court this Term in Grogan v. Garner, --- U.S. ----, 111 S.Ct. 654, 112 L.Ed.2d 755 lowered the standard of proof, holding that the preponderance of the evidence standard governs the dischargeability exceptions in 11 U.S.C. Sec. 523(a)
 
 
 [4]
 Citing Prudential Insurance Co. of America v. Sipula, 776 F.2d 157 (7th Cir.1985), Hallahan argues that he did not tortiously interfere in Ozark's contractual relations with its customers. The bankruptcy court declined to discuss the claim for tortious interference with contract brought by plaintiffs, finding that Hallahan's willful breach of his own contract with Ozark was enough to support a determination of non-dischargeability under Section 523(a)(6). Like the bankruptcy court, we will not address the tort claim
 
 
 [5]
 Two hundred policyholders had cancelled within three months. Plaintiffs' experts presented statistics comparing the company-wide "lapse" rate to Hallahan's personal lapse rate in 1984, his first year away from Ozark. In premium dollars, Ozark had a 12.6% lapse rate while Hallahan's was over 50%. From this type of information, the court could permissibly conclude that Hallahan's actions contributed to Ozark's losses
 
 
 [6]
 Both parties cite Illinois case law on the issue of damages, apparently agreeing that Illinois is the state with which the contract has the most significant contacts. See Dr. Franklin Perkins School v. Freeman, 741 F.2d 1503, 1515 n. 19 (7th Cir.1984)
 
 
 [7]
 The parties stipulated that if the damages award was upheld, the award of attorney's fees would remain undisturbed
 
 
 [8]
 "Core" proceedings encompass most important matters arising in the bankruptcy case. 28 U.S.C. Sec. 157(b)(2) (1988) is a non-exclusive list of core proceedings, and includes inter alia "matters concerning the administration of the estate," 28 U.S.C. Sec. 157(b)(2)(A), the "allowance or disallowance of claims against the estate," 28 U.S.C. Sec. 157(b)(2)(B), "proceedings to determine, avoid, or recover preferences" and "fraudulent conveyances," 28 U.S.C. Sec. 157(b)(2)(F) and (H), "determinations as to the dischargeability of particular debts" and "objections to discharges," 28 U.S.C. Sec. 157(b)(2)(I) and (J). The statute sets out no affirmative definition of related, or non-core, proceedings
 
 
 [9]
 Even actions that are deemed "legal" after application of the two-part test can be heard without a jury trial if the legal cause of action involves "public rights." Granfinanciera, 492 U.S. at 52, 109 S.Ct. at 2796, citing Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 589, 593-594, 105 S.Ct. 3325, 3337, 3339-3340, 87 L.Ed.2d 409; Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 74-76, 102 S.Ct. 2858, 2873-2874, 73 L.Ed.2d 598. Congress does not exceed its Article III power when it assigns cases revolving around public rights to a non-Article III forum in which jury trials are unavailable. With respect to Granfinanciera's jury demand, the Court stated that "a bankruptcy trustee's action right to recover a fraudulent conveyance under 11 U.S.C. Sec. 548(a)(2) seems to us more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions." Granfinanciera, 492 U.S. at 55, 109 S.Ct. at 2797
 
 
 [10]
 The Supreme Court was careful in Granfinanciera to point out that the idea of creditors "subjecting themselves" to the equitable jurisdiction of a bankruptcy court differs from the traditional notion of "waiver." Waiver suggests election of one alternative over another, but creditors lack "an alternative forum to the bankruptcy court in which to pursue their claims." Granfinanciera, 492 U.S. at 59 n. 14, 109 S.Ct. at 2799 n. 14. The "waiver" notion might properly be applied to debtors, however, for the filing of a bankruptcy petition is a voluntary act. See United States v. Kras, 409 U.S. 434, 445, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973) (bankruptcy is not the only method available to a debtor for the adjustment of the legal relationship with his creditors)
 
 
 [11]
 We do not address any question regarding the Seventh Amendment jury trial rights of involuntary debtors
 
 
 [12]
 The Supreme Court has noted that 28 U.S.C. Sec. 1411 is "notoriously ambiguous." Granfinanciera, 492 U.S. at 40 n. 3, 109 S.Ct. at 2789 n. 3
 
 
 [13]
 Because we hold that Hallahan had no constitutional or statutory right to a jury trial for his dischargeability claim, we need not reach the issue of whether bankruptcy courts are empowered to conduct jury trials when a litigant has a right to one. The Supreme Court expressly reserved this question in Granfinanciera, see 492 U.S. at 64, 109 S.Ct. at 2802. Circuit courts subsequently have split on the issue. Compare In re Ben Cooper, Inc., 896 F.2d 1394 (2d Cir.1990) (bankruptcy judge is authorized by Code and Constitution to conduct jury trial in core proceeding), certiorari granted sub nom. Insurance Co. of Pennsylvania v. Ben Cooper, Inc., --- U.S. ----, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990), vacated, --- U.S. ----, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), reinstated on remand, 924 F.2d 36 (2nd Cir.1991), certiorari denied, --- U.S. ----, 111 S.Ct. 2041, 114 L.Ed.2d 126 (U.S.1991), with In re United Missouri Bank of Kansas City, N.A., 901 F.2d 1449 (8th Cir.1990) (Code does not authorize bankruptcy judge to conduct jury trial); In re Kaiser Steel Corp., 911 F.2d 380 (10th Cir.1990) (same)